PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———

Nos. 09-3603 & 09-3661

———

ALBERT W. FLORENCE

v.

BOARD OF CHOSEN FREEHOLDERS
OF THE COUNTY OF BURLINGTON;
BURLINGTON COUNTY JAIL;
WARDEN JUEL COLE,
Individually and officially as Warden
of Burlington County Jail;
ESSEX COUNTY CORRECTIONAL FACILITY;
ESSEX COUNTY SHERIFF'S DEPARTMENT;
STATE TROOPER JOHN DOE,
Individually and in his capacity as a State Trooper;
JOHN DOES 1-3 of Burlington County Jail &
Essex County Correctional Facility who
performed the strip searches;
JOHN DOES 4-5

Essex County Correctional Facility;
Essex County Sheriff's Department, Appellants in 09-3603

Board of Chosen Freeholders of the County of Burlington;
Warden Juel Cole, Appellants in 09-3661

—

On Appeal from the United States District Court
for the District of New Jersey
(D. C. No. 1-05-cv-03619)
District Judge: Honorable Joseph J. Rodriguez

—

Argued April 15, 2010

Before: SLOVITER and HARDIMAN, *Circuit Judges*
and *POLLAK, *District Judge*.

(Filed: September 21, 2010)


Susan C. Lask [Argued]
Suite 2369
244 Fifth Avenue
New York, NY 10001

Michael V. Calabro
Suite 200
466 Bloomfield Avenue
Newark, NJ 07104-0000
        *Attorneys for Appellee Albert W. Florence*

---

*Hon. Louis H. Pollak, Senior District Judge for the U.S. District Court for the Eastern District of Pennsylvania, sitting by designation.

J. Brooks DiDonato [Argued]
Stacy L. Moore, Jr.
Parker McCay
7001 Lincoln Drive West
3 Greentree Centre, P.O. Box 974
Marlton, NJ 08053-0000
      *Attorney for Burlington County Board of*
      *Chosen Freeholders* and *Juel Cole;*
      *Appellees in 09-3603 & Appellants in 09-3661*

Alan Ruddy [Argued]
Office of County Counsel
County of Essex
465 Martin Luther King Boulevard
Hall of Records, Room 535
Newark, NJ 07102-0000
      *Attorney for Essex County Correctional Facility and*
      *Essex County Sheriff's Department;*
      *Appellants in 09-3603 & Appellees in 09-3661*

Sean X. Kelly
Sean Robins
Marks, O'Neill, O'Brien & Courtney
6981 North Park Drive
Suite 300
Pennsauken, NJ 08091-0000
      *Attorney for Amicus Appellant County of Atlantic and*
*Gary Merline*

Seth R. Lesser
Klafter Olsen & Lesser

Two International Drive
Suite 350
Rye Brook, NY 10573

*Attorney for Amicus Appellees Ronald Allen, Edward*
*Bizarro, Joseph DePietro, Donald Dillard,*
*Mel Free El, Tammy Marie Hass, Alphonso Johnson,*
*John Moore, Konstanti Sidieras, Paul M. Takacs,*
*April Wedding, Harvey Weintraub, Justin Wennah,*
*Sandra King Wilson and Richard Wright*

Ernest R. Bazzana
Mary Massaron-Ross
Plunkett Cooney
535 Griswold Street
Buhl Building, Suite 2400
Detroit, MI 48226-0000

*Attorneys for Amicus Appellant Meadowbrook Inc.,*
*New Jersey County Jail Wardens Association,*
*Sheriffs Association of New Jersey*

Edward L. Barocas
American Civil Liberties Union of New Jersey Foundation
89 Market Street
P.O. Box 32159
Newark, NJ 07102-0000

*Attorney for Amicus Appellees Robert J. Del Tufo;*
*Zulima Farber, John Farmer, Peter C. Harvey,*
*Deborah T. Poritz*

James M. Mets
Mets, Schiro McGovern

655 Florida Grove Road
P.O. Box 668
Woodbridge, NJ 07095-0000
   *Attorney for Amicus Appellant Policemens Benevolent*
   *Association Local 249*

Jennifer R. Clarke
Public Interest Law Center of Philadelphia
1709 Benjamin Franklin Parkway
United Way Building
Philadelphia, PA 19103

David Rudovsky
Kairys, Rudovsky, Messing & Feinberg
718 Arch Street
Suite 501 South
Philadelphia, PA 19106-0000
   *Attorney for Amicus Appellee Pennsylvania Prison*
*Society*

-----

OPINION OF THE COURT

-----

HARDIMAN, *Circuit Judge*.

This interlocutory appeal requires us to decide whether it is constitutional for jails to strip search arrestees upon their admission to the general population. Although the question is one of first impression for this Court, the Supreme Court's

5

decision in *Bell v. Wolfish*, 441 U.S. 520 (1979), and the many cases that followed it inform our analysis.

In *Bell*, the Supreme Court rejected a Fourth Amendment challenge to a policy of visual body cavity searches for all detainees—regardless of the reason for their incarceration—after contact visits with outsiders. *Id.* at 560. The Court applied a balancing test and concluded that the visual body cavity searches were reasonable because the prison's security interest justified the intrusion into the detainees' privacy.

Since *Bell* was decided, ten circuit courts of appeals applied its balancing test and uniformly concluded that an arrestee charged with minor offenses may not be strip searched consistent with the Fourth Amendment unless the prison has reasonable suspicion that the arrestee is concealing a weapon or other contraband. Things changed in 2008, however, when the en banc Court of Appeals for the Eleventh Circuit reversed its prior precedent and held that a jail's blanket policy of strip searching all arrestees upon entering the facility was reasonable even in the absence of individualized suspicion. *Powell v. Barrett*, 541 F.3d 1298, 1314 (11th Cir. 2008) (en banc). A year later, the en banc Court of Appeals for the Ninth Circuit also reversed its prior precedent and upheld a blanket policy of strip searching all arrestees before they enter San Francisco's general jail population. *Bull v. City and County of San Francisco*, 595 F.3d 964, 975 (9th Cir. 2010) (en banc).

Confronted with a clear dichotomy between the en banc decisions of the Ninth and Eleventh Circuits on the one hand

and the numerous cases that preceded them on the other, we must determine which line of cases is more faithful to the Supreme Court's decision in *Bell*.

## I.

## A.

We begin with the facts surrounding the arrest and detention of lead Plaintiff Albert Florence. On March 3, 2005, a New Jersey state trooper stopped the car in which Florence was a passenger and arrested him based on an April 25, 2003 bench warrant from Essex County. The warrant charged Florence with a non-indictable variety of civil contempt. Though Florence protested the validity of the warrant by insisting he had already paid the fine on which it was based, he was arrested and taken to the Burlington County Jail (BCJ).

According to Florence, he was subjected to a strip and visual body-cavity search by corrections officers at BCJ. During the jail's intake process, Florence was directed to remove all of his clothing, then open his mouth and lift his tongue, hold out his arms and turn around, and lift his genitals. The officer conducting the search sat approximately arms-length in front of him, and directed Florence to shower once the search was complete. Florence was held at BCJ for six days.

During Florence's sixth day at BCJ, the Essex County Sheriff's Department took custody of him and transported him to the Essex County Correctional Facility (ECCF). Florence alleges that he was subjected to another strip and visual

body-cavity search upon his arrival at ECCF. As described by Florence, he and four other detainees were instructed to enter separate shower stalls, strip naked and shower under the watchful eyes of two corrections officers. After showering, Florence was directed to open his mouth and lift his genitals. Next, he was ordered to turn around so he faced away from the officers and to squat and cough. After donning ECCF-issued clothing and visiting a nurse, Florence joined the general jail population until the following day, when the charges against him were dismissed.

After his release, Florence sued BCJ, ECCF, and various individuals and municipal entities (collectively, the Jails) under 42 U.S.C. § 1983. While Florence asserted numerous constitutional claims, the only claim germane to this appeal is his Fourth Amendment challenge to the strip search procedures at BCJ and ECCF.

B.

On March 20, 2008, the District Court granted Florence's motion for class certification, defining the plaintiff class as:

> All arrestees charged with non-indictable offenses who were processed, housed or held over at Defendant Burlington County Jail and/or Defendant Essex County Correctional Facility from March 3, 2003 to the present date who were directed by Defendants' officers to strip naked before those officers, no matter if the officers term that procedure a "visual observation" or

8

otherwise, without the officers first articulating a reasonable belief that those arrestees were concealing contraband, drugs or weapons[.]

*Florence v. Bd. of Chosen Freeholders of the County of Burlington*, 2008 WL 800970, at *17 (D.N.J. Mar. 20, 2008).[1]

Following discovery, the parties filed cross motions for summary judgment. In reviewing the motions, the District Court first considered whether the intake procedures at each facility rose to the level of a "strip search." *Florence v. Bd. of Chosen Freeholders of the County of Burlington*, 595 F. Supp. 2d 492, 502 (D.N.J. 2009). To resolve this question, the District Court reviewed the Jails' written search policies[2] as well as the

---

[1] Florence sought class certification only on his strip search claims; he did not seek certification on his claim that he was subjected to a visual body cavity search. *Florence v. Bd. of Chosen Freeholders of the County of Burlington*, 2008 WL 800970, at *8 n.5 (D.N.J. Mar. 20, 2008).

[2] BCJ's written policy defined a strip search as "[a] physical search of an inmate by the same sex officer while unclothed consisting of routine and systematic visual observation of the inmate's physical body to look for distinguished identifying marks, scars or deformities, signs of illness, injury or disease and/or the concealment of contraband on the inmate's body." *Burlington County Detention Center/Corrections & Work Release Center Policies and Procedures: Search of Inmates - No. Section 1186*, Supp. App. at 42.

deposition testimony of correctional officers and the wardens at each facility. Ultimately, the District Court concluded that, while there were facts in dispute—such as whether non-indictable male arrestees at BCJ were required to lift their genitals during the search—these disputes were immaterial because even the undisputed procedures of instructing arrestees to remove all of their clothing and subject their naked bodies to visual inspection "rose to the level of a strip search" under the Fourth Amendment. *Id*. at 502-03 ("Whatever the case may be, a discrepancy of this sort does not necessarily provide a genuine issue of material fact. . . . 'It's just common sense. Take off all your clothes. You're strip[] searched.'" (quoting Plaintiffs' counsel)).

---

The policy in effect at ECCF from September 2002 through April 2005 provided that all arrestees were to be strip searched and required to shower. *Department of Public Safety General Order No. 89-17*, Supp. App. 34. A "strip search" under the written policy is to consist of an officer "observ[ing] carefully while the inmate undresses" and examining the arrestee's ears, nose, hair and scalp, the interior of the mouth, fingers, hands, arms and armpits, and all body openings and the inner thighs. *Id*. The superceding ECCF policy, *Department of Corrections Administrative Directive No. 04-06*, requires that officers "conduct a thorough search of individual inmates," direct arrestees to shower during intake, and "observe and document, in writing, any evidence of: a) notable body markings such as 'tattoos;' b) [b]ody vermin or disease; [and] c) [o]pen sores, visible wounds, scars, [or] injuries" on the arrestees' bodies. Supp. App. at 40.

10

The District Court found that BCJ's "blanket" strip search policy "entails a complete disrobing, followed by an examination of the nude inmate for bruises, marks, wounds or other distinguishing features by the supervising officer, which is then followed by a supervised shower with a delousing agent." *Id.* at 502. The Court found that ECCF utilized similar strip-search and supervised-shower procedures; however, the ECCF procedures were slightly more intrusive because "Essex officers carefully observed the entire naked body of the inmate, including body openings and inner thighs." *Id.* at 503.[3] Having thus defined the Jails' respective search policies, the District Court concluded that the procedures failed the *Bell* balancing test and observed that "blanket strip searches of non-indictable offenders, performed without reasonable suspicion for drugs, weapons, or other contraband, [are] unconstitutional." *Id.* at 513. Based on this holding, the District Court granted the Plaintiffs' motion for summary judgment on the unlawful search claim, but denied the Plaintiffs' request for a preliminary injunction. *Id.* at 519. The Court denied Defendants' cross-motion which sought qualified and Eleventh Amendment immunity. *Id.*

Following the decision, the Jails moved the District Court to certify its summary judgment as an appealable order pursuant to 28 U.S.C. § 1292(b). The District Court agreed that the order "involve[d] a controlling question of law as to which there is substantial ground for difference of opinion," *id.*, and we

---

[3] The Jails do not challenge the District Court's factual findings regarding the scope of the strip search policies. Rather, they assert that such searches are permissible under *Bell*.

11

granted permission to appeal.  The District Court certified the following question for our review: "whether a blanket policy of strip searching all non-indictable arrestees admitted to a jail facility without first articulating reasonable suspicion violates the Fourth Amendment of the United States Constitution as applied to the States through the Fourteenth Amendment." *Florence v. Bd of Chosen Freeholders of the County of Burlington*, 657 F. Supp. 2d 504, 511 (D.N.J. 2009) (order certifying issue for appeal).  "In reviewing an interlocutory appeal under 28 U.S.C. § 1292(b), this court exercises plenary review over the question certified."  *Morris v. Rumsfeld*, 420 F.3d 287, 290 (3d Cir. 2005).

## II.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures."  U.S. Const. amend. IV.  To enforce this guarantee, government officials are limited to only those searches which are reasonable.  *Delaware v. Prouse*, 440 U.S. 648, 653-54 (1979).  Reasonableness under the Fourth Amendment is a flexible standard, *Bodine v. Warwick*, 72 F.3d 393, 398 (3d Cir. 1995), "not capable of precise definition or mechanical application," *Bell*, 441 U.S. at 559.  "In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails."  *Id.*

Detention in a correctional facility "carries with it the circumscription or loss of many significant rights."  *Hudson v. Palmer*, 468 U.S. 517, 524 (1984).  "The curtailment of certain rights is necessary, as a practical matter, to accommodate a

12

myriad of institutional needs and objectives of prison facilities, chief among which is internal security." *Id.* (internal quotation marks and citations omitted). Because privacy is greatly curtailed by the nature of the prison environment, a detainee's Fourth Amendment rights are likewise diminished. *See id.* at 526 (holding that "the Fourth Amendment proscription against unreasonable searches does not apply within the confines of the prison cell"); *Bell*, 441 U.S. at 537 ("Loss of freedom of choice and privacy are inherent incidents of confinement in such a facility.").

While the Supreme Court has "repeatedly held that prisons are not beyond the reach of the Constitution[,]" *Hudson*, 468 U.S. at 523, it has also emphasized that the judiciary has a "very limited role" in the administration of detention facilities, *Block v. Rutherford*, 468 U.S. 576, 584 (1984). Indeed, detention facilities have been described as "unique place[s] fraught with serious security dangers," *Bell*, 441 U.S. at 559, the management of which "courts are ill equipped to deal with," *id.* at 548 n.30. Therefore, authorities are entitled to considerable latitude in designing and implementing prison management policies. *Thornburgh v. Abbott*, 490 U.S. 401, 407-08 (1989). As the Supreme Court cautioned in *Bell*: "[p]rison administrators . . . should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." 441 U.S. at 547. In addition to prison administrators' "professional expertise," separation of powers and federalism concerns support "wide-ranging deference" to the decisions of prison authorities. *Id.* at 548 ("[J]udicial deference is accorded not

13

merely because the administrator ordinarily will, as a matter of fact in a particular case, have a better grasp of his domain than the reviewing judge, but also because the operation of our correctional facilities is peculiarly the province of the Legislative and Executive branches of our Government, not the Judicial."); *Turner v. Safley*, 482 U.S. 78, 84-85 (1987) ("[S]eparation of powers concerns counsel a policy of judicial restraint. Where a state penal system is involved, federal courts have . . . additional reason to accord deference to the appropriate prison authorities.").

## A.

Having explained the general standards that govern our inquiry, we turn to the Supreme Court's pathmarking decision in *Bell v. Wolfish*. Although there are factual differences between *Bell* and the instant case, they are sufficiently similar to warrant a detailed review of *Bell*.

In *Bell*, pretrial detainees and convicted prisoners confined at the Metropolitan Correctional Center (MCC)—a federally operated short-term custodial facility—filed suit challenging numerous prison practices and conditions of confinement. 441 U.S. at 523-24. Although the primary purpose of MCC was to house pretrial detainees awaiting trial on federal criminal charges, the facility also housed: witnesses in protective custody, contemnors, inmates awaiting sentencing or transportation to federal prison, inmates serving relatively short sentences, and inmates lodged under writs of habeas corpus issued to ensure their presence at trial. *Id.* at 524. The population at MCC was quite transient, with 50% of its inmates

14

spending fewer than 30 days at the facility and 73% of the population spending fewer than 60 days at MCC. *Id*. at 524 n.3.

Among the conditions of confinement challenged by the inmates at MCC was the policy of strip and visual body-cavity searches after contact visits with outsiders. Under that policy, all persons housed at MCC—regardless of the reason for their detention—were "required to expose their body cavities for visual inspection as a part of a strip search conducted after every contact visit with a person from outside the institution." *Id.* at 558. For males, this required "lift[ing] [the] genitals and bend[ing] over to spread [the] buttocks for visual inspection." *Id*. at 558 n.39. "The vaginal and anal cavities of female inmates also [were] visually inspected." *Id*. Inmates were not touched by officers during the searches. *Id*.

The district court in *Bell* upheld the strip searches but held the visual body cavity searches unreasonable under the Fourth Amendment. *Id.* at 558. The Court of Appeals for the Second Circuit affirmed, finding that the "gross violation of personal privacy inherent in such a search cannot be outweighed by the government's security interest in maintaining a practice of so little actual utility." *Id*. (internal quotation marks omitted).

The Supreme Court reversed, holding that the visual body-cavity searches were reasonable under the Fourth Amendment. *Id.* As a preliminary matter, the Court assumed without deciding that both convicted prisoners and pretrial detainees retain some Fourth Amendment rights upon commitment to a correctional facility. *Id*. It then explained that,

in each case, the test of Fourth Amendment reasonableness requires "a balancing of the need for the particular search against the invasion of personal rights that the search entails," and instructed courts to consider four factors in assessing reasonableness: "the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." *Id*. at 559.

In applying the balancing test to the search policy, the Supreme Court cited MCC's dual objectives of detecting and deterring smuggling of weapons and other contraband, recognizing that "[s]muggling of money, drugs, weapons, and other contraband is all too common an occurrence." *Id*. The Court upheld the policy despite the absence of any evidence of smuggling problems at MCC as the record contained only one instance where an inmate was caught with contraband in a body cavity. *Id*. Nevertheless, the Court found the lack of evidence supported the prison's interest in the policy because it was "more a testament to the effectiveness of this search technique as a deterrent than to any lack of interest on the part of inmates to secrete and import such items when the opportunity arises." *Id*.

Significantly, *Bell* included just one sentence discussing the scope of the privacy intrusion, in which the Court stated that it "d[id] not underestimate the degree to which these searches may invade the personal privacy of inmates." *Id*. at 560. And though it acknowledged that correctional officers may sometimes conduct the searches in an impermissibly abusive fashion, the Supreme Court did not address that issue; rather, it limited its review to the policy as a whole, "deal[ing] . . . with

16

the question whether visual body-cavity inspections as contemplated by the MCC rules can *ever* be conducted on less than probable cause grounds." *Id*. The Court answered that question in the affirmative. Moreover, the Court rejected the district court's consideration of alternative, less-intrusive means of detecting contraband. Even assuming the availability of such alternatives, the Court deferred to MCC's choice of security procedure because it had not been shown to be "irrational or unreasonable." *Id*. at 559 n.40.

## B.

In the years following *Bell*, ten circuit courts of appeals applied the Supreme Court's balancing test to strip searches of individuals arrested for minor offenses and found the searches unconstitutional where not supported by reasonable suspicion that the arrestee was hiding a weapon or contraband.[4] In

---

[4] *See Wilson v. Jones*, 251 F.3d 1340, 1343 (11th Cir. 2001) (blanket policy of strip searches upon intake to jail unreasonable when applied to DUI arrestee absent reasonable suspicion); *Roberts v. Rhode Island*, 239 F.3d 107, 113 (1st Cir. 2001) (blanket policy of strip searching arrestees was unreasonable as applied to those arrested for minor offenses); *Kelly v. Foti*, 77 F.3d 819, 821 (5th Cir. 1996) ("Jail officials may strip search a person arrested for a minor offense and detained pending the posting of bond only if they possess a reasonable suspicion that he is hiding weapons or contraband."); *Masters v. Crouch*, 872 F.2d 1248, 1255 (6th Cir.) ("[A]uthorities may not strip search persons arrested for traffic violations and nonviolent minor offenses solely because such

17

persons ultimately will intermingle with the general population at a jail when there were no circumstances to support a reasonable belief that the detainee will carry weapons or other contraband into the jail."), *cert. denied*, 493 U.S. 977 (1989); *Weber v. Dell*, 804 F.2d 796, 802 (2d Cir. 1986) ("[T]he Fourth Amendment precludes prison officials from performing strip/body cavity searches of arrestees charged with . . . minor offenses unless the officials have a reasonable suspicion that the arrestee is concealing weapons or other contraband."), *cert. denied*, 483 U.S. 1020 (1987); *Jones v. Edwards*, 770 F.2d 739, 742 (8th Cir. 1985) (strip search of misdemeanor detainee arrested for violation of leash law where police had no reason to suspect arrestee would secrete weapon or contraband into holding cell was unreasonable under *Bell*); *Giles v. Ackerman* 746 F.2d 614, 615 (9th Cir. 1984) ("[A]rrestees for minor offenses may be subjected to a strip search only if jail officials have a reasonable suspicion that the particular arrestee is carrying or concealing contraband or suffering from a communicable disease."), *cert. denied*, 471 U.S. 1053 (1985); *Hill v. Bogans*, 735 F.2d 391, 394 (10th Cir. 1984) (unreasonable to strip search individual arrested for traffic violation on way to work at 7:30 a.m. because there was no reasonable suspicion that he was concealing contraband even though arrestee was briefly intermingled with the general jail population)*; Mary Beth G. v. City of Chicago*, 723 F.2d 1263, 1273 (7th Cir. 1983) (strip search of female arrestees charged with minor offenses were unreasonable "without a reasonable suspicion by the authorities that either of the twin dangers of concealing weapons or contraband existed"); *Logan v. Shealy*, 660 F.2d 1007, 1013 (4th Cir. 1981) ("An indiscriminate strip

18

general, these courts concluded that the extreme invasion of privacy caused by a strip and/or visual body-cavity search outweighed the prison's minimal interest in searching an individual charged with a minor crime shortly after arrest. *See, e.g., Giles v. Ackerman*, 746 F.2d 614, 617 (9th Cir. 1984); *Mary Beth G. v. City of Chicago*, 723 F.2d 1263, 1273 (7th Cir. 1983). The critical factor in balancing the competing interests was the belief that individuals arrested for minor offenses presented a relatively slight security risk because they usually are arrested unexpectedly whereas the contact visits in *Bell* may have been arranged specifically for the purpose of smuggling weapons or drugs. *See, e.g., Shain v. Ellison*, 273 F.3d 56, 64 (2d Cir. 2001) ("It is far less obvious that misdemeanor arrestees frequently or even occasionally hide contraband in their bodily orifices. Unlike persons already in jail who receive contact visits, arrestees do not ordinarily have notice that they are about to be arrested and thus an opportunity to hide something."); *Roberts v. Rhode Island*, 239 F.3d 107, 111 (1st Cir. 2001) ("[T]he deterrent rationale for the *Bell* search is simply less relevant given the essentially unplanned nature of an arrest and subsequent incarceration.").

Recently, the Eleventh and Ninth Circuits, sitting en banc, reversed their prior precedents and held that *Bell* authorizes a policy of blanket strip searches for all arrestees entering the general population of a jail. *See Powell v. Barrett*,

search policy routinely applied to detainees . . . cannot be constitutionally justified simply on the basis of administrative ease in attending to security considerations."), *cert. denied*, 455 U.S. 942 (1982).

541 F.3d 1298 (11th Cir. 2008) (en banc) (overruling *Wilson v. Jones*, 251 F.3d 1340 (11th Cir. 2001)); *Bull v. City and County of San Francisco*, 595 F.3d 964 (9th Cir. 2010) (en banc) (overruling *Giles v. Ackerman* 746 F.2d 614 (9th Cir. 1984)).

In *Powell*, the Eleventh Circuit reviewed a policy of strip searching all arrestees at the time of intake implemented by the Fulton County Jail in Georgia. The policy required that all persons entering the jail's general population be strip searched regardless of the crime charged and without any individualized suspicion. *Powell*, 541 F.3d at 1301. The booking process required groups of 30 to 40 arrestees to enter a large shower room, simultaneously remove all of their clothing, place it in boxes and then shower. *Id.* "After the group shower each arrestee either singly, or standing in a line with others, is visually inspected front and back by deputies. Then each man takes his clothes to a counter and exchanges his own clothes for a jail jumpsuit." *Id.* (internal quotation marks, brackets, and citations omitted). The Eleventh Circuit discussed in great detail the facts and circumstances surrounding the searches at issue in *Bell*, which demonstrated the high level of intrusiveness that the Supreme Court countenanced as reasonable. The Eleventh Circuit also noted the paltry record of body-cavity smuggling at MCC as evidence of the significant deference provided to prison administrators by the Court in *Bell*. In light of these points, the Eleventh Circuit determined that most courts (and its own prior precedent) misinterpreted *Bell* to require reasonable suspicion for strip searches of minor offenders. *Id.* at 1307. It opined that the decisions requiring reasonable suspicion failed to give appropriate deference to the judgments of prison administrators and ignored the fact that in upholding

20

visual body-cavity searches, the Supreme Court in *Bell* neither required individualized suspicion of smuggling nor differentiated the degree of suspicion required based on the type of offender. *Id.* at 1307-11.

The *Powell* court also disagreed with the majority view that security interests at the time of intake are less important than those arising after an inmate's contact visit with an outsider, describing "an inmate's initial entry into a detention facility" as "coming after one big and prolonged contact visit with the outside world." *Id.* at 1313. The court asserted that the "need for strip searches at all detention facilities, including county jails, is not exaggerated." *Id.* at 1310. Citing other cases, the court noted the problem of gang violence in prisons and observed that gang members might "coerce, cajole, or intimidate lesser violators into smuggling contraband into the facility." *Id.* at 1311 (citation omitted). In light of these security concerns, the Eleventh Circuit held that "a policy or practice of strip searching all arrestees as part of the process of booking them into the general population of a detention facility, even without reasonable suspicion to believe that they may be concealing contraband, is constitutionally permissible" at least where the search is no more intrusive than the search in *Bell*. *Id.* at 1300.

Like the Eleventh Circuit in *Powell*, the Ninth Circuit in *Bull v. City and County of San Francisco* reversed prior precedent and upheld the San Francisco Sheriff's policy authorizing strip searches of all arrestees before they are placed in the general population of a county jail. *Bull*, 595 F.3d at 966. In rejecting its prior requirement of reasonable suspicion for

arrestee strip searches, the *Bull* court relied on much of the same reasoning as the Eleventh Circuit in *Powell*, including its view that decisions interpreting *Bell v. Wolfish* to require reasonable suspicion to strip search minor offenders were analytically flawed. *Id*. at 977-78. The Ninth Circuit concluded that "the scope, manner, and justification for San Francisco's strip search policy was not meaningfully different from the scope, manner, and justification for the strip search policy in *Bell*." *Id.* at 975. Based on the record presented, the justification for searching arrestees at the time of intake was even higher than the justification for the post-contact visit searches in *Bell* because San Francisco had amassed a record demonstrating "a pervasive and serious problem with contraband inside San Francisco's jails" as well as instances of contraband smuggled within body cavities. *Id*.

## C.

Mindful of the newly-minted circuit split we have described, we proceed to apply *Bell*'s balancing test to the question certified for interlocutory appeal in this case.[5] The

[5] In *Bull*, the Ninth Circuit held the constitutionality of a prison strip search was governed by *Turner v. Safley*, 482 U.S. 78 (1987), in addition to *Bell v. Wolfish*. *Bull*, 595 F.3d at 973-74. Neither the Supreme Court nor this Court has applied the rational-relationship test of *Turner* to a Fourth Amendment challenge to prison policies. While it is arguable that some Fourth Amendment rights are "inconsistent with proper incarceration" and therefore covered by *Turner*, *see Johnson v. California*, 543 U.S. 499, 510 (2005) (internal quotation marks

22

Jails rely heavily on *Powell* in support of their argument that strip searches satisfy the reasonableness standard of *Bell*. They argue that the searches serve the valid prison interests of "eliminating weapons and drugs from the jail environment, serving to mitigate gang violence and preventing disease," and that these concerns apply to indictable and non-indictable arrestees alike. On behalf of the Plaintiff class, Florence counters that the District Court properly applied *Bell*, and that we should adopt the reasonable suspicion requirement applied by the majority of our sister circuits. Florence also challenges the legitimacy of the gang, health, and contraband concerns as justifications for the strip search of non-indictable arrestees as unsupported by the record and argues that there are less intrusive alternatives to satisfy the Jails' security interests.

Like the Supreme Court in *Bell*, we assume detainees maintain some Fourth Amendment rights against searches of

---

omitted), absent an express statement from the Supreme Court that *Turner* supplanted *Bell*, we find its framework for the analysis of detainee constitutional claims inapplicable here. *See Hohn v. United States*, 524 U.S. 236, 252-53 (1998) ("Our decisions remain binding precedent until we see fit to reconsider them, regardless of whether subsequent cases have raised doubts about their continuing vitality."). Moreover, the Jails do not seek application of *Turner* to Plaintiffs' Fourth Amendment claims. *See* Appellants' Reply Br. at 17 ("Some courts have ruled that the *Turner* case, with its easier standard, has overruled *Bell*. Appellants have not argued that *Turner*, and the rational basis test, should be the standard before the Court.").

their person upon entry to a detention facility.[6]  *See Bell*, 441 U.S. at 558; *but see Doe v. Delie*, 257 F.3d 309, 316 (3d Cir. 2001) (noting that under *Hudson v. Palmer*, 468 U.S. 517 (1984), "prisoners do not have a Fourth Amendment right to privacy in their cells").  To determine whether the strip search procedures at BCJ and ECCF violate the Fourth Amendment, we first consider the scope of the searches at issue.

We have previously recognized that a strip search constitutes a "significant intrusion on an individual's privacy." *United States v. Whitted*, 541 F.3d 480, 486 (3d Cir. 2008). Here, the strip search policies require the arrestees to undress completely and submit to a  visual observation of their naked bodies before taking a supervised shower. We do not minimize the extreme intrusion on privacy associated with a strip search by law enforcement officers; however, the searches at issue here are less intrusive than the visual body-cavity searches considered by the Supreme Court in *Bell*.  In fact, they are closer to the strip searches upheld by the lower court in *Bell*.

The searches were also conducted in a similar manner and place as those in *Bell*—by correctional officers at a detention facility.  The policies governing strip searches at BCJ require that they be conducted "in private . . . under sanitary conditions . . . [and] in a professional and dignified manner." Moreover, the searches are relatively brief, such that between the search and supervised shower, an arrestee is not required to

---

[6] Other courts of appeals have gone further, holding that "the Fourth Amendment does apply to the invasion of bodily privacy in prisons." *See Bull*, 595 F.3d at 974-75.

24

remain naked for more than several minutes. Because the scope, manner, and place of the searches are similar to or less intrusive than those in *Bell*, the only factor on which Plaintiffs could distinguish this case is the Jails' justification for the searches.

Detention facilities are "unique place[s] fraught with serious security dangers." *Bell*, 441 U.S. at 559. We have recognized that New Jersey jails, like most correctional facilities, face serious problems caused by the presence of gangs. *See Fraise v. Terhune*, 283 F.3d 506, 521-22 (3d Cir. 2002) (upholding New Jersey prison policy of identifying gang members and transferring core members to Security Threat Group Management Unit). The Jails cite three specific security interests to justify strip searches: (1) the detection and deterrence of smuggling weapons, drugs or other contraband into the facility, (2) the identification of gang members by observing their tattoos, and (3) the prevention of disease, specifically Methicillin-resistant Staphylococcus aureus (MRSA). Of these three, the potential for smuggling of weapons, drugs, and other contraband poses the greatest security threat.

It is self-evident that preventing the introduction of weapons and drugs into the prison environment is a legitimate interest of concern for prison administrators. *See Bell*, 441 U.S. at 540 ("[T]he Government must be able to take steps to maintain security and order at the institution and make certain no weapons or illicit drugs reach detainees."); *see also Overton v. Bazzetta*, 539 U.S. 126, 134 (2003) ("Drug smuggling and drug use in prison are intractable problems.") (citing *Bell*, *Block*, and *Hudson*); *Block*, 468 U.S. at 586 (upholding total ban on

25

contact visits as reasonably related to prison interest in preventing security concerns including "open[ing] the institution to the introduction of drugs, weapons, and other contraband"). Prevention of the entry of illegal weapons and drugs is vital to the protection of inmates and prison personnel alike. *See Bell*, 441 U.S. at 547 ("Prison officials must be free to take appropriate action to ensure the safety of inmates and corrections personnel . . . ."); *Bull*, 595 F.3d at 967 (citing instance in which inmate used razor-blades secreted in rectal cavity to attempt suicide); *see also E.E.O.C. v. The GEO Group, Inc.*, - - - F.3d - - - -, 2010 WL 2991380, at *8 (3d Cir. Aug. 2, 2010) ("A prison is not a summer camp and prison officials have the unenviable task of preserving order in difficult circumstances").

Like the Ninth and Eleventh Circuit Courts of Appeals, we conclude that the security interest in preventing smuggling at the time of intake is as strong as the interest in preventing smuggling after the contact visits at issue in *Bell*. We reject Plaintiffs' argument that blanket searches are unreasonable because jails have little interest in strip searching arrestees charged with non-indictable offenses. This argument cannot be squared with the facts and law of *Bell*. First, the *Bell* court explicitly rejected any distinction in security risk based on the reason for detention. *Bell*, 441 U.S. at 546 n.28 ("There is no basis for concluding that pretrial detainees pose any lesser security risk than convicted inmates."). Instead, the security risk was defined by the fact of detention in a correctional facility.[7]

_____

[7] For similar reasons, we reject Plaintiffs' argument that the searches are unreasonable because non-indictable arrestees

26

*See also*, *Fuentes v. Wagner*, 206 F.3d 335, 347 (3d Cir. 2000) ("[I]t is impractical to draw a line between convicted prisoners and pretrial detainees for the purpose of maintaining jail security." (citation omitted)).

Second, *Bell* did not require individualized suspicion for each inmate searched; it assessed the facial constitutionality of the policy as a whole, as applied to all inmates at MCC.[8]  *Bell*,

---

have greater Fourth Amendment rights than the pretrial detainees in *Bell*.  We are not presented with an argument that it was improper for the Jails to detain members of the Plaintiff class in the first place; thus we address only the constitutionality of the policy as applied to people properly assigned to the Jails and entering the general population.  The *Bell* analysis applies equally to all individuals so assigned—whether they be convicted inmates, indicted pretrial detainees, contemnors, material witnesses, or arrestees awaiting preliminary hearings before a magistrate.

[8] The absence of an individualized suspicion requirement in *Bell* is consistent with the Fourth Amendment doctrine of special needs searches.  "[T]here are instances when a search furthers a 'special governmental need' beyond that of normal law enforcement such that the search, although not supported by the typical quantum of individualized suspicion, can nonetheless still be found constitutionally 'reasonable.'"  *Neumeyer v. Beard*, 421 F.3d 210, 214 (3d Cir. 2005) (prison policy of randomly searching visitors' vehicles was reasonable because privacy intrusion was outweighed by prison's "special need to maintain the security and safety of the prison").

27

441 U.S. at 560 (bypassing concerns regarding abuses during particular searches to uphold policy as a whole, stating: "we deal here with the question whether visual body-cavity inspections as contemplated by the MCC rules can *ever* be conducted on less than probable cause. Balancing the significant and legitimate security interests of the institution against the privacy interests of the inmates, we conclude that they can."). MCC housed pretrial detainees, convicted inmates, and even non-offenders held as material witnesses, all of whom were included in the plaintiff class. *See Bell*, 441 U.S. at 524.

We also disagree with Plaintiffs' contention that the risk that non-indictable offenders will smuggle contraband is low because arrest for this category of offenses is often unanticipated. Even assuming that most such arrests are unanticipated, this is not always the case. It is plausible that incarcerated persons will induce or recruit others to subject themselves to arrest on non-indictable offenses to smuggle weapons or other contraband into the facility. This would be especially true if we were to hold that those incarcerated on non-indictable offenses are, as a class, not subject to search. For that reason, we agree with the concern expressed by the Eleventh Circuit in *Powell* that gang members would be likely to exploit an exception from security procedures for minor offenders. 541 F.3d at 1311.

A similar risk was recognized by the Supreme Court in *Block v. Rutherford*, where the Court upheld a prison policy denying contact visits to pretrial detainees regardless of the crime charged. 468 U.S. 576, 589 (1984). In *Block*, the district court permitted the denial of contact visits for high risk

28

detainees, but required the jail to provide visits for pretrial detainees "concerning whom there is no indication of drug or escape propensities." *Id.* at 580 n.2. The Supreme Court rejected the lower court's characterization of a blanket ban on contact visits as disproportionate to the risks posed by low level detainees. In doing so, the Court reasoned that inmates would likely take advantage of any gap in security: "[i]t is not unreasonable to assume, for instance, that low security risk detainees would be enlisted to help obtain contraband or weapons by their fellow inmates who are denied contact visits." *Id.* at 587.

It is also important to note that the opportunity for smuggling during the contact visits in *Bell* was low. As described by the district court in that case, "inmates and their visitors are in full view during the visits and fully clad. The secreting of objects in rectal or genital areas becomes in this situation an imposing challenge to nerves and agility." *Wolfish v. Levi*, 439 F. Supp. 114, 147 (S.D.N.Y. 1977). Despite these obstacles to an inmate obtaining contraband from a visitor and hiding it in a body cavity, the Supreme Court still found that MCC's interest in detecting and deterring this low risk of smuggling outweighed the privacy intrusion. If it is reasonable to assume that a prisoner will try to arrange for a visitor to deliver contraband during a contact visit, it is equally reasonable to assume that a detainee will arrange for an accomplice on the outside to subject himself to arrest for a non-indictable offense to smuggle contraband into the facility. Thus, the Jails' interest in preventing smuggling at the time of intake is just as high as MCC's interest after the contact visits in *Bell*.

29

The Plaintiff class argues that the Jails cannot rely on an interest in preventing smuggling because they have not presented any evidence of a past smuggling problem or any instance of a non-indictable arrestee attempting to secrete contraband. It is true that the Jails' justifications for strip searches would be stronger if supported by evidence regarding discovery of contraband on indictable and non-indictable offenders during intake, and the incidence with which gang members are arrested for non-indictable offenses. *See, e.g., Bull*, 595 F.3d at 975. Nonetheless, our interpretation of the Supreme Court's decision in *Bell* leads us to conclude that the Jails are not required to produce such a record.

In *Bell*, the single instance of attempted smuggling did not undermine MCC's justification for the search. Quite to the contrary, the Court considered the absence of a record to be evidence of the policy's successful deterrent effect. *Bell*, 441 U.S. at 559. Likewise here, strip searches at the time of intake also have significant deterrent value. If non-indictable offenders were not subject to automatic search it would create a security gap which offenders could exploit with relative ease.

The *Bell* court did not require a record of smuggling to justify MCC's interest in preventing it (in fact, there was no time for a long history of smuggling to have developed as the *Bell* plaintiffs filed their case only four months after MCC opened). *Id.* at 526. The Supreme Court declared that "[s]muggling of money, drugs, weapons, and other contraband is all too common an occurrence" at detention facilities. *Id*. at 559. In addition to the sole instance of smuggling in the record, *Bell* relied upon cases concerning other detention facilities for

30

the proposition that inmates attempt to secrete items in their body cavities. *See id*. (citing *Ferraro v. United States*, 590 F.2d 335 (6th Cir. 1978), and *United States v. Park*, 521 F.2d 1381, 1382 (9th Cir. 1975)).

Finally, we also find significant that the Supreme Court repeatedly has emphasized that courts must defer to the policy judgments of prison administrators. *See, e.g.*, *Bell*, 441 U.S. at 531 (repeating "admonition" from *Procunier v. Martinez*, 416 U.S. 396, 405 (1974), that "courts are ill equipped to deal with the increasingly urgent problems of prison administration," and therefore "it would 'not be wise for [a court of appeals] to second-guess the expert administrators on matters on which they are better informed.'" (internal brackets omitted)); *Cutter v. Wilkinson*, 544 U.S. 709, 725 n.13 (2005) ("It bears repetition, however, that prison security is a compelling state interest, and that deference is due to institutional officials' expertise in this area."). Moreover, we have stated that "deference is especially appropriate when a regulation implicates prison security." *Fraise*, 283 F.3d at 516; *see also Overton*, 539 U.S. at 133 (internal security is "perhaps the most legitimate of penological goals"). This emphasis on deference further supports the proposition that the absence of evidence of smuggling at a particular correctional institution does not demonstrate the unreasonableness of a policy implemented to prevent smuggling. A detention facility need not suffer a pattern of security breaches before it takes steps to prevent them where those steps are neither "irrational [n]or unreasonable." *See Bell*, 441 U.S. at 559 n.40; *E.E.O.C.*, - - - F.3d at - - - - , 2010 WL 2991380, at *8.

31

Plaintiffs assert that the Jails' interest in preventing smuggling could be achieved through means less intrusive than strip searches. Specifically, Plaintiffs point to the Body Orifice Scanning System (BOSS Chair), "[a] non-intrusive scanning system designed to detect small weapons or contraband metal objects concealed in oral, anal, or vaginal cavities," a security method already used by ECCF. In *Bell*, the Supreme Court rejected the district court's reliance on the less-intrusive means of metal detection in evaluating searches at MCC. *Id.* The Court found metal detection to be less effective than the visual search procedure and deferred to the prison administrator's decision to use the visual search method. Florence's argument regarding the BOSS Chair fails for the same reasons. Aside from the fact that there is no evidence regarding the efficacy of the BOSS Chair in detecting metallic objects, it would not detect drugs and other non-metallic contraband. Accordingly, the decision not to rely exclusively on the BOSS Chair is not unreasonable.

As asserted by the Jails, a blanket policy will help to avoid potential equal protection concerns in the strip search process as it removes officer discretion in selecting which arrestees to search. The potential for abuse in a "reasonable suspicion" scheme is high, particularly where reasonable suspicion may be based on such subjective characteristics as the arrestee's appearance and conduct at the time of arrest. *See, e.g., Hartline v. Gallo*, 546 F.3d 95, 100 (2d Cir. 2008) (reasonable suspicion to strip search a misdemeanor arrestee may be "based on the crime charged, the particular characteristics of the arrestee, and/or the circumstances of the arrest" (internal quotations and citation omitted)); *see also*

32

*Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 663 (1995) (expressing preference for policy of drug-testing all student athletes as opposed to testing based on suspicion of drug use because suspicion-based testing "brings the risk that teachers will impose testing arbitrarily upon troublesome but not drug-likely students"). Subjecting all arrestees to the same policy promotes equal treatment. *See Bull*, 595 F.3d at 983 (Kozinski, J., concurring) (observing that blanket searches of all individuals participating in the same activity "trade the protection afforded by individualized suspicion for the protection derived from the fact that the government treats all similarly situated people in precisely the same way").

In sum, balancing the Jails' security interests at the time of intake before arrestees enter the general population against the privacy interests of the inmates, we hold that the strip search procedures described by the District Court at BCJ and ECCF are reasonable. Accordingly, we will reverse the District Court's grant of summary judgment on Plaintiffs' Fourth Amendment strip search claim and remand for further proceedings consistent with this opinion.[9]

---

[9] Having found that the Jails' valid interest in preventing smuggling justifies the strip searches, we need not determine whether the interests in identifying gang members and detecting MRSA infection are sufficient to justify the searches.

*Florence v. Board of Chosen Freeholders of the County of Burlington, et al.*

Nos. 09-3603 & 09-3661

POLLAK, *District Judge*, dissenting.

### I.

I respectfully disagree with the court's opinion. I think Judge Rodriguez's decision should be affirmed, and I would expressly predicate the order of affirmance on his comprehensive, finely crafted, and characteristically thoughtful opinion.

### II.

In upholding as constitutional strip searches of persons detained on non-indictable offenses and with respect to whom there is no individualized ground for suspicion that they may be bringing contraband into a detention facility, the court finds the en banc opinions of the Eleventh Circuit, *Powell* v. *Barrett,* 541 F.3d 1298 (11th Cir. 2008), and of the Ninth Circuit, *Bull v. City and County of San Francisco,* 595 F.3d 964 (9th Cir. 2010), persuasive. For my part, I find greater wisdom in Judge Barkett's dissent in *Powell* and Judge Thomas's dissent in *Bull.*

Judge Thomas's *Bull* dissent frames the issues this way:

The majority sweeps away twenty-five years of jurisprudence, giving jailors the unfettered right to conduct mandatory, routine, suspicionless body cavity searches on any citizen who may be

arrested for minor offenses, such as violating a leash law or a traffic code, and who pose no credible risk for smuggling contraband into the jail. Under its reconfigured regime, the majority discards *Bell's* requirement of balance the need for a search against individual privacy and instead blesses a uniform policy of performing body cavity searches on everyone arrested and designated for the general jail population, regardless of the triviality of the charge or the likelihood that the arrestee is hiding contraband.

The rationale for this abrupt precedential departure is founded on quicksand. Indeed, the government's entire argument is based on the logical fallacy *cum hoc ergo propter hoc*– happenstance implies causation. The government argues that contraband has been found in the San Francisco jails. Thus, the government reasons, individuals who are arrested must be smuggling contraband into the jail. Therefore the government concludes it must body cavity search everyone who is arrested, even those who pose no risk of concealing contraband, much less of trying to smuggle contraband into the jail.

This reasoning finds no support from the record in this case. Although there is evidence of some arrestees attempting to conceal contraband during their arrest, there is not a single document example of anyone doing so with the intent of

2

smuggling contraband into the jail. More importantly, for our purposes, there is not a single example of anyone from the class defined by the district court who was found to possess contraband upon being strip search. Not one.

*Bull*, 595 F.3d at 990.

In his District Court opinion, Judge Rodriguez makes a point which gives special cogency to Judge Thomas's "Not one":

. . .[I]t is worth noting that neither county submits supporting affidavits that detail evidence of a smuggling problem specific to their respective facilities.

*Florence* v. *Bd. of Chosen Freeholders*, 595 F. Supp. 2d 492, 513 (D.N.J. 2009).[1]

---

[1] The court says that "[i]t is plausible that incarcerated persons will induce or recruit others to subject themselves to arrest on non-indictable offenses to smuggle weapons or other contraband into the facility." One might doubt that individuals would deliberately commit minor offenses such as civil contempt—the offense for which Florence was arrested—and then secrete contraband on their person, all in the hope that they will, at some future moment, be arrested and taken to jail to make their illicit deliveries. Nonetheless, the point made by Judge Rodriguez establishes that what might in some imagined circumstances be "plausible" is without support in the record

3

Judge Barkett's *Powell* dissent sums up the issues with special force:

> Like the majority, I recognize and appreciate the deference due to jail administrators as they fulfill their charge of ensuring security in jails, not only for the jail officials but also for the inmates. *See Bell v. Wolfish,* 441 U.S. 520, 547-48 (1979). At the same time, "convicted prisoners do not forfeit all constitutional protections by reason of their conviction and confinement in prison." *Id.* at 545. This principle applies with at least as much force to individuals detained prior to their trial on petty misdemeanor charges such as failing to pay child support, driving without a license, or trespassing. *See id.* These protections, such as the right to be free from degrading, humiliating, and dehumanizing treatment and the right to bodily integrity, include protection against forced nakedness during strip searches in front of others.

*Powell*, 541 F.3d at 1315.

---

before Judge Rodriguez–the record binding on Judge Rodriguez and on this court.

4