Francis M. **BURKE**

v.

**TWP. OF CHELTENHAM, et al.**

Civil Action No. 10–1508.

United States District Court, E.D. Pennsylvania.

Oct. 5, 2010.

---

Daniel Pallen, The Ben–Ari Law Firm, Media, PA, for Francis M. Burke.

Christopher Paul Boyle, Joseph J. Santarone, Jr., Marshall Dennehey Warner Coleman & Goggin, King of Prussia, PA, for Twp. of Cheltenham, et al.

## MEMORANDUM

DALZELL, District Judge.

Plaintiff Francis W. Burke ("Burke") sues defendants—consisting of the Township of Cheltenham ("Township") and a group of police officers working for the Township—on an array of federal civil rights and pendent state tort claims arising out of Burke's April 6, 2008 arrest for

public drunkenness and disorderly conduct. Burke alleges that he was unnecessarily restrained, strip searched, and physically assaulted in the course of his arrest, and then charged, without basis, with further criminal offenses in retaliation for filing a complaint about the April 6 incident.

Burke brings suit against varying combinations of defendants for (1) unlawful search and seizure, (2) false arrest and false imprisonment, (3) use of excessive force, (4) malicious prosecution, (5) retaliation in violation of the First Amendment, and (6) failure to supervise—all under 42 U.S.C. § 1983—as well as for (7) assault and battery and (8) intentional infliction of emotional distress under Pennsylvania tort law. Defendants move for partial dismissal of Burke's claims under Federal Rule of Civil Procedure 12(b)(6), arguing that (1) certain of Burke's civil rights claims are barred by his ultimate conviction on the charge of disorderly conduct, (2) his Fourteenth Amendment claims are subsumed by his Fourth Amendment claims, (3) his prayer for punitive damages may not be granted against a governmental entity, (4) he has failed to identify a custom, practice, or policy justifying municipal liability, and (5) the individual defendants are entitled to qualified immunity. For the reasons set forth below, we will grant the defendants' motion in part and deny it in part.

## I. *Factual Background*

When considering a motion to dismiss under Fed.R.Civ.P. 12(b)(6), a court should, at the threshold, "accept all factual allegations in the complaint as true and give the pleader the benefit of all reasonable inferences that can be fairly drawn therefrom." *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir.1993). As will be seen, Burke proffers no lack of detail for the "short and plain" statements that Fed. R.Civ.P. 8(a)(2) requires.

According to Burke's amended complaint, on April 6, 2008, around 9:30 P.M., he was working on his car in the driveway of his home and listening to music from the car. Am. Compl. at ¶¶ 12–13. Burke's ex-wife, Dawn Welch ("Welch"), who was also present at his home, asked him to turn down the music. It is unclear from his complaint whether Burke did so. What the complaint does make clear is that Welch ultimately telephoned the Cheltenham Police Department, which promptly sent three officers to the scene. Am. Compl. at ¶¶ 14–15.

Officers Michael Corbo ("Corbo") and Chiofolo ("Chiofolo")—the complaint fails to supply the latter officer's first name—approached Burke and ordered him to turn off or turn down his car radio and remove his keys from the car's ignition. Burke allegedly complied with both requests. Am. Compl. at ¶¶ 16–20. Chiofolo asked Burke if he had been drinking alcohol, and Burke responded that he had consumed a beer many hours before, during the afternoon. Am. Compl. at ¶ 21.

Chiofolo told Burke that "I ought to arrest you for driving under the influence," and ordered Burke to place his hands behind his back, but when Burke hesitated Chiofolo repeated his order, informing Burke that he was being handcuffed "for safety purposes." Am. Compl. at ¶¶ 22–25. As Chiofolo placed the handcuffs on Burke, the plaintiff told him that he had nerve damage in his left arm, as well as a weakened knee. Am. Compl. at ¶ 26. Burke claims that Chiofolo nonetheless unnecessarily tightened the handcuffs, causing him intense pain. Am. Compl. at ¶ 27.

The officers then ordered Burke to sit on the curb by the side of the road—a request with which Burke allegedly complied—returned to their cars for a time,

then approached Burke and attempted to further interrogate him. This attempt proved unsuccessful because Burke had decided to stop answering the officers' questions. Am. Compl. at ¶¶ 28–30. The complaint asserts that this decision so agitated the officers that they ordered Burke to disrobe, which he began to do once they removed his handcuffs. Am. Compl. at ¶¶ 31–35. The officers demanded that Burke remove his shoes as well, and as Burke reached down to unlace his shoes he asked the officers why he had to undress in front of his neighbors. Am. Compl. at ¶¶ 36–37. The officers allegedly offered no response. Instead, Corbo and Chiofolo are said to have grabbed Burke by his upper arms and shoulders; they then violently threw him to the asphalt street where Burke's head and face hit the ground, causing him severe pain. Am. Compl. at ¶¶ 37–39.

There ensued an "unlawful assault" on a "non-resistant and defenseless Burke," as Burke puts it. Am. Compl. at ¶¶ 46, 40. The complaint avers that an officer pushed Burke's face into the asphalt and held it there while two other officers began violently ripping off Burke's clothing and removing his shoes, in the process intentionally gouging Burke's torso with their fingernails and/or other sharp objects. Am. Compl. at ¶¶ 41–43. Officer O'Neil ("O'Neil")—again, the complaint supplies no first name—intentionally and forcefully dropped his knee into the right side of Burke's face, striking him and causing him more intense pain, and the Complaint further depicts Burke being kicked in his injured left leg and repeatedly punched in his upper arms, chest, and shoulders. Am. Compl. at ¶¶ 44–45.

As Burke remained on the ground, still partially naked and said to be writhing in pain, the police allegedly instructed him to get dressed. He was then re-handcuffed, forced to his feet, and dragged to a police cruiser, where the complaint claims the defendant officers intentionally battered Burke's head on the hood of the police cruiser before depositing him in the cruiser. Am. Compl. at ¶¶ 46–49. Corbo then took Burke to the Cheltenham Police station and, rather than booking him, the three officers allegedly took him to the juvenile holding area. Am. Compl. at ¶¶ 50–51.

As Burke waited in the holding area, Officer Baskins ("Baskins")—again left mononymic in the complaint—approached him and allegedly again ordered him to disrobe. Am. Compl. at ¶ 52. When Burke questioned the request, the complaint avers that Baskins picked Burke up by his shoulders and proceeded forcefully to slam him into a stone/concrete wall inside the juvenile holding area, which induced Burke, out of fear and intimidation, to strip off all his clothing, leaving only a silver St. Jude medallion hanging around his neck. Am. Compl. at ¶¶ 53–59. Baskins allegedly demanded that Burke remove the medallion, but Burke protested that he could not do so due to the injuries he had sustained in his arrest at his house. Am. Compl. at ¶¶ 59–60. In response, Baskins yanked the metal chain forward and snapped it off the back of plaintiff's neck, causing him severe pain. Am. Compl. at ¶¶ 61–62.

"After this last of humiliations," the complaint asserts that the police allowed Burke to dress himself. He was then processed and ultimately charged with public drunkenness and disorderly conduct. Am. Compl. at ¶¶ 63–64. Burke was acquitted on the former charge but pled guilty to the latter. Am. Compl. at ¶¶ 66–68.

On April 9, 2008, Burke filed a complaint with the Internal Affairs unit at the Cheltenham Police Department, which is headed by Lieutenant John Salmon ("Salmon").

Am. Compl. at ¶¶ 69–70. In this complaint, Burke alleged wrongful conduct by Corbo, Chiofolo, O'Neil, and Baskins. Burke was interviewed, and returned to the Police station on May 19, 2008 to review a typed copy of the interview. Am. Compl. at ¶¶ 70–74. On August 21, 2008, Burke learned that the Cheltenham Police Department had charged him with eight crimes: two counts of "Unsworn Falsification to Authorities," two counts of "Statement Under Penalty," two counts of "False Report–False Incrimination of Another," and two counts of "Obstruction of Administration of Law/Other Government Function." Am. Compl. at ¶¶ 76, 78. Burke claims that these charges were retaliatory. Am. Compl. at ¶ 77. Two of the charges were withdrawn prior to trial and Burke was acquitted of the remaining charges at a bench trial on March 8, 2010. Am. Compl. at ¶¶ 79–81.

## II. *Analysis*

As noted, Burke alleges eight distinct claims against some or all of the defendants, and defendants move, on a variety of grounds, for dismissal of some of them under Fed.R.Civ.P. 12(b)(6).

■ In recent years, "pleading standards have seemingly shifted from simple notice pleading to a more heightened form of pleading, requiring a plaintiff to plead more than the possibility of relief to survive a motion to dismiss." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir.2009). A pleading may not simply offer "labels and conclusions," *Bell Atlantic v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, —— U.S. ——, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009). Moreover, "only a complaint that states a plausible claim for relief survives a motion to dismiss," giving rise to a "context-specific" inquiry that "requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 1950. This standard is not as demanding as a "probability requirement," but it does oblige a plaintiff to allege facts sufficient to show that there is "more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 1949 (internal quotation marks omitted). "Factual allegations must be enough to raise a right to relief above the speculative level," *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955, though plaintiffs need only "nudge[ ] their claims across the line from conceivable to plausible." *Id.* at 569, 127 S.Ct. 1955.

■ In deciding a Rule 12(b)(6) motion, courts "consider only the allegations in the complaint, exhibits attached to the complaint, matters of public record, and documents that form the basis of a claim." *Brown v. Daniels*, 128 Fed.Appx. 910, 913 (3d Cir.2005) (quoting *Lum v. Bank of America*, 361 F.3d 217, 222 n. 3 (3d Cir. 2004)) (internal quotation marks omitted). A document forms the basis of a claim if it is "integral to or explicitly relied upon in the complaint." *Id.* (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir.1997)) (emphasis omitted).

### A. *Official Capacity*

■ Burke asserts some of his claims against Corbo, Salmon, and John Norris (Chief of Police of Cheltenham Township) in their official capacities. "[O]fficial capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent," *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 n. 55, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), and a court should treat such suits against public officers as if they were brought against the governmental entities

for which they work. *See, e.g., Mitros v. Cooke,* 170 F.Supp.2d 504, 506 (E.D.Pa. 2001). Given that each of Burke's claims against Corbo, Salmon, and Norris in their official capacities is also asserted against the Township, we serve little purpose by retaining these claims against the named police officers. Thus, we will dismiss Count IV—alleging malicious prosecution—with respect to Corbo, Salmon, and Norris in their official capacities, and Count V—alleging retaliation in violation of the First Amendment—with respect to Norris in his official capacity, while retaining these claims against the Township of Cheltenham.

## B. *Heck v. Humphrey and Counts I, II, and III*

■ Defendants argue that "certain of Plaintiff's claims for violation of his civil rights, related to his April 6, 2008 arrest, are barred by the Supreme Court's ruling in *Heck v. Humphrey.*" Defs.' Mot. to Dismiss at 4. In *Heck v. Humphrey,* 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994), that Court held that "in order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus." *Id.* at 486–87, 114 S.Ct. 2364 (footnote omitted). While defendants do not specify which counts of the amended complaint this argument addresses, we will take it to challenge Counts I and II— against Corbo, Chiofolo, and O'Neil ("the arresting officers") and Baskins in their individual capacities—and Count III— against the arresting officers and Baskins

in their individual capacities, and against the Township—since it is these counts that allege violations of Burke's civil rights related to his arrest on April 6, 2008.

Defendants claim that since "[p]laintiff himself has pled that he 'did tender a plea of guilty to disorderly conduct—unreasonable noise,' " "probable cause for his arrest has been indisputably established" and plaintiff's § 1983 claim cannot be sustained. Defs.' Mot. to Dismiss at 5. For his part, plaintiff responds that since he "was also charged with public drunkenness as a result of the April 6, 2008, arrest" and "was subsequently acquitted on that charge," he "has pled a successful outcome at the lower Court level" as *Heck* requires. Pl.'s Resp. to Defs.' Mot. to Dismiss at 7–9.

■ *Heck* does not require that any § 1983 claim for unconstitutional conviction or imprisonment include a demonstration that the conviction or sentence has been reversed or otherwise called into question, as defendants seem to suggest and plaintiff appears to accept. As the Supreme Court explained,

> [W]hen a state prisoner seeks damages in a § 1983 suit, the district court must consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence; if it would, the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated. But if the district court determines that the plaintiff's action, even if successful, will *not* demonstrate the invalidity of any outstanding criminal judgment against the plaintiff, the action should be allowed to proceed, in the absence of some other bar to the suit.

512 U.S. at 487, 114 S.Ct. 2364 (emphasis in original) (footnote omitted). *Heck,* then, teaches that we must conduct two inquiries

in evaluating a § 1983 claim: first, whether the claim suggests the invalidity of an "outstanding criminal judgment against the plaintiff"; second, *if* the claim does imply such invalidity, we must dismiss it *unless* the plaintiff can demonstrate "that the conviction or sentence has already been invalidated." *Id.* Taking up the second inquiry first, Burke does not suggest in his complaint that his conviction for disorderly conduct was ever invalidated. Thus, the key question under *Heck* is whether his claims under Counts I, II, and III imply the invalidity of this particular conviction.

▇ Count I of Burke's amended complaint alleges that his arrest on April 6, 2008 constituted an "unlawful search or seizure" on several grounds. Am. Compl. at ¶¶ 82–84. Burke argues first that his "custodial detention was not predicated on probable cause and served no legitimate governmental interest," and that "Officer Baskins contributed to unlawfully prolonging an illegal seizure by detaining Burke against his will in the juvenile holding area without probable cause." *Id.* at ¶¶ 90, 95. These claims duplicate those in Count II where Burke alleges that since "there were no facts within the knowledge of the officers which were sufficient to warrant a prudent man in believing that Burk [*sic*] had committed or was committing an offense," he was falsely arrested and falsely imprisoned on April 6, 2008. *Id.* at ¶ 106. We will analyze both claims together.

▇ In evaluating a false arrest claim, "[t]he proper inquiry ... is not whether the person arrested in fact committed the offense but whether the arresting officers had probable cause to believe the person arrested had committed the offense." *Groman v. Township of Manalapan,* 47 F.3d 628, 634 (3d Cir.1995) (quoting *Dowling v. City of Phila.,* 855 F.2d 136, 141 (3d Cir.1988)) (internal punc-

tuation omitted). Moreover, "where the police lack probable cause to make an arrest, the arrestee has a claim under § 1983 for false imprisonment based on a detention pursuant to that arrest." *Id.* at 636 (citing *Thomas v. Kippermann,* 846 F.2d 1009, 1011 (5th Cir.1988)). It is at least conceivable that arresting officers could lack probable cause to arrest and detain even if the evidence later supports conviction beyond a reasonable doubt. This could occur if the arresting officers were not privy to all the information that *later* supported conviction. Consequently, a plaintiff alleging false arrest and false imprisonment need not *necessarily* also imply the invalidity of a later conviction.

Here, however, Burke pled guilty to disorderly conduct under 18 Pa.C.S.A. § 5503(a)(2), which provides that "[a] person is guilty of disorderly conduct if, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof, he ... makes unreasonable noise." Burke admits in his complaint that on the evening of April 6, 2008, (1) he was listening to music at a decibel level disturbing to Welch; (2) after asking Burke to turn down the music, Welch called the police; (3) upon arriving at the scene, Corbo told Burke to turn down his radio; and (4) shortly thereafter, the arresting officers placed Burke under arrest. Thus, at the time of arrest, the arresting officers had access to all the information regarding Burke's conduct on the evening of April 6, 2008 that later supported his conviction for disorderly conduct—either second-hand, through Welch's complaint, or first-hand, through observation of Burke's behavior. Thus, it is not possible for Burke to argue that the arresting officers lacked probable cause to arrest and detain him without *also* arguing that his later conviction for disorderly conduct was invalid. *Heck v. Humphrey* thus forecloses Burke's claims

of false arrest and false imprisonment under Counts I and II.

Burke next alleges that "[a] reasonable police officer ... would not have restrained the Plaintiff in handcuffs." Am. Compl. at ¶ 94. A suspect challenging his restraint in handcuffs must show not only that the handcuffing officers did not have probable cause to arrest him, but also that there was "no basis to believe that the suspect pose[d] a threat or to fear his escape." *Hall v. Raech,* 677 F.Supp.2d 784, 794 (E.D.Pa.2010) (Yohn, J.). But Burke cannot challenge whether the defendant officers had probable cause to arrest him without also implying the invalidity of his later conviction, so we need not consider whether Burke could prove that he posed no threat or risk of escape. *Heck* forecloses Burke's claim under Count I that he was illegally restrained in handcuffs.

 Third, Burke claims that "no facts exist demonstrating or justifying the need for the two strip searches." Am. Compl. at ¶ 97. We will examine the validity of these searches more extensively in Part II.F, *infra.* Generally speaking, however, strip searches will be upheld under the Fourth Amendment if they are "reasonable under the circumstances," *U.S. v. Clemons,* 2010 WL 597992, at *4 (W.D.Pa. 2010) (citing *Bell v. Wolfish,* 441 U.S. 520, 558–59, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979)), where factors to consider include "the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." *Wolfish,* 441 U.S. at 559, 99 S.Ct. 1861. Since Burke's claim that the strip searches were unreasonable will thus focus on the circumstances under which they occurred, and not his ultimate culpability for an offense, he may contend that the searches were unreasonable without claiming that his later conviction was

invalid. Consequently, *Heck* does not foreclose Burke's claim under Count I that he was unlawfully strip searched.

 Finally, Burke alleges in Count III that he was the victim of excessive force in violation of the Fourth Amendment, in light of "the lack of probable cause to effectuate the arrest" and considering that "a reasonable police officer in the position of either Corbo, Chiofolo, O'Neil, or Baskins would not have employed such disproportionate force" given that "(i) Burke was cooperating with the officers; and (ii) was evidently not armed or dangerous." Am. Compl. at ¶¶ 119, 121–22. As already discussed, Burke's assertion that his seizure was not justified by probable cause cannot advance without a concomitant challenge to his ultimate conviction for disorderly conduct; thus, *Heck* forecloses this ground. Regarding the latter ground, "[w]hen a police officer uses force to effectuate an arrest that force must be reasonable." *Groman,* 47 F.3d 628, 634 (3d Cir.1995) (citing *Graham v. Connor,* 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)). Since Burke's disproportionate force claim will focus on the reasonableness of officers' conduct during his arrest and not the validity of his later conviction for disorderly conduct, his excessive force claim will survive *Heck* to the extent that it is predicated only on the use of such disproportionate force.

To recapitulate, Burke's conviction on the charge of disorderly conduct does not, under *Heck,* foreclose his civil rights claims under Count I for unlawful search and seizure based on his two strip searches or under Count III for the use of excessive force. Burke may demonstrate liability under each of these counts without impugning the validity of his later conviction for disorderly conduct. But *Heck* does bar Burke from pursuing two of the grounds asserted under Count I—false ar-

rest and false imprisonment, and unlawful restraint in handcuffs—as well as all of Count II and one of the grounds—lack of probable cause—asserted under Count III.

### C. *The Fourteenth Amendment and Counts II and V*

Defendants next contend that while "[p]laintiff brings civil rights claims under the First, Fourth and Fourteenth Amendments pursuant to 42 U.S.C. § 1983," the Fourteenth Amendment claim is "subsumed by his First and Fourth Amendment claim" and "should be dismissed with prejudice." Defs.' Mot. to Dismiss at 5–6. Burke responds with the observation that "[t]he only mention of the Fourteenth Amendment with respect to any specific claim in Plaintiff's Complaint is in Count II—False Arrest & False Imprisonment," and further asserts "that the Third Circuit Court of Appeals has recognized both a deprivation of Fourth and Fourteenth Amendment rights for this particular cause of action." Pl.'s Resp. to Defs.' Mot. to Dismiss at 10.

In *Groman v. Twp. of Manalapan*, 47 F.3d 628 (3d Cir.1995) our Court of Appeals indeed explained that "[a] cause of action exists under § 1983 when a law enforcement officer uses force so excessive that it violates the Fourth and Fourteenth Amendments to the United States Constitution." *Id.* at 633–34 (citing *Brown v. Borough of Chambersburg*, 903 F.2d 274, 277 (3d Cir.1990)). Since defendants concede that "[t]he First and Fourth Amendments are, of course, made applicable to the states by the Fourteenth Amendment," Defs.' Mot. to Dismiss at 5, it seems that what defendants seek here is merely the recognition that Burke does not have independent claims for false arrest and false imprisonment under both the Fourth and Fourteenth Amendments, or for retaliation, under both the First and Fourteenth Amendments.

While we endorse this characterization—and plaintiff does not take issue with it—we view with less favor the suggestion that Burke's Fourteenth Amendment claim "should be dismissed with prejudice." Burke asserts no independent claim under the Fourteenth Amendment. *Cf. Hall v. Raech*, 2009 WL 811503, at *3 (E.D.Pa. 2009) (Yohn, J.) (dismissing excessive force claims entirely predicated on the Fourteenth Amendment's due process standards). There is simply no claim to dismiss here.

### D. *Punitive Damages and Counts III, IV, V, and VI*

 Defendants contend that "punitive damages may not be recovered against a governmental entity in an action brought under 42 U.S.C. § 1983," Defs.' Mot. to Dismiss at 6 (citing *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981)), and that punitive damages are similarly barred against "[d]efendant[s] in [their] official capacity[ies] only." *Id.* (brackets in original) (quoting *Mitros v. Borough of Glenolden*, 170 F.Supp.2d 504, 508 (E.D.Pa.2001)). Happily, plaintiff agrees, conceding (as he must) that "[t]o the extent Plaintiff's Amended Complaint asserts punitive damages against the Township or persons in their official capacities, said assertion was either in error or misconstrued by Defendants." Pl.'s Resp. to Defs.' Mot. to Dismiss at 10–11. Consequently, we will grant as unopposed defendants' request that "all claims for punitive damages against the Defendants in their official capacities, and against Cheltenham Township, must be dismissed with prejudice." Defs.' Mot. to Dismiss at 7.

 Burke correctly maintains that he does not waive his "right to seek punitive

damages against Defendant officers and other named Defendants in their individual capacities." Pl.'s Resp. to Defs.' Mot. to Dismiss at 11. This does no more than restate the Supreme Court's teaching in *Smith v. Wade*, 461 U.S. 30, 56, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983), that "[a] jury may be permitted to assess punitive damages in an action under § 1983 when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others".

### E. *Municipal Liability and Counts III, IV, V, and VI*

Defendants contend that "[p]laintiff has identified no ... custom, practice or policy" that could support municipal liability under *Monell v. Dep't of Soc. Servs.*, Defs.' Mot. to Dismiss at 8, and that "[t]o the extent Plaintiff's claims can be construed as claims of failure to train, discipline and supervise, they fail, as well." *Id.* at 9. Interestingly, Burke admits that "it would be patently absurd to expect a Plaintiff to be able to deduce and prove at the time of his pleading that an offending municipality had a policy or custom which was the moving force behind his or her constitutional violations without some sort of limited discovery," Pl.'s Resp. to Defs.' Mot. to Dismiss at 15. He also concedes that "there is absolutely no way Plaintiff, Burke, can demonstrate at the time of pleading as to whether or not Cheltenham Township had tolerated known misconduct in the past without some permit of discovery." *Id.* at 16. But Burke argues that he does not need to plead these facts in order to survive a Rule 12(b)(6) motion, since "[t]he law shields Plaintiff from having to prove his *Monell* claim and carrying a higher burden at the time of pleading." *Id.* at 14.

■ In order to show municipal liability under § 1983, as a general proposition a plaintiff must show that "the alleged constitutional transgression implements or executes a policy, regulation, or decision officially adopted by the governing body or informally adopted by custom." *McTernan v. City of York*, 564 F.3d 636, 657 (3d Cir.2009) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)). Burke's amended complaint alleges wrongs not only by the Township, but by its Police Chief, Norris, who most certainly constitutes a municipal "decisionmaker" under *Monell*. See, e.g., *id.* at 658–59 (characterizing the police chief as a municipal decisionmaker). Whether a municipal decisionmaker's actions constitute policy or custom that may give rise to municipal liability is, however, a complicated question.

■ Our Court of Appeals two decades ago summarized the *Monell* jurisprudence on this point:

A governmental policy or custom can be established in two ways. Policy is made when a decisionmaker possessing final authority to establish municipal policy with respect to the action issues an official proclamation, policy, or edict. A course of conduct is considered to be a custom when, though not authorized by law, such practices of state officials are so permanent and well settled as to virtually constitute law.

*Andrews v. City of Phila.*, 895 F.2d 1469, 1480 (3d Cir.1990) (brackets and internal quotation marks omitted). This might seem to suggest that only official edicts or well-settled practices can support municipal liability. The jurisprudence negates such a suggestion. In *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986), the Supreme Court concluded that "where action is directed by those who establish

governmental policy, the municipality is equally responsible whether that action is to be taken only once or to be taken repeatedly." In *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 404, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997), the Court clarified: "it is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality. The plaintiff must also demonstrate that, through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged." (emphasis in original). Under this test, "proof that a municipality's legislative body or authorized decisionmaker has intentionally deprived a plaintiff of a federally protected right necessarily establishes that the municipality acted culpably. Similarly, the conclusion that the action taken or directed by the municipality or its authorized decisionmaker itself violates federal law will also determine that the municipal action was the moving force behind the injury of which the plaintiff complains." *Id.* at 405, 117 S.Ct. 1382.

Burke claims under Count IV that Norris initiated proceedings against him and chose to prosecute him maliciously, Am. Compl. at ¶¶ 144, 146, and under Count V asserts that Norris treated Burke adversely as a consequence of his filing a complaint. *Id.* at ¶ 153. Under Count VI, Burke alleges that Norris communicated a message of approval to the other defendant officers regarding their conduct when he decided to prosecute Burke on eight baseless charges. *Id.* at ¶ 166.

 Respecting Count IV, "[t]o prove malicious prosecution under section 1983 when the claim is under the Fourth Amendment, a plaintiff must show that: (1) the defendant initiated a criminal proceeding; (2) the criminal proceeding ended in his favor; (3) the defendant initiated the proceeding without probable cause; (4) the

defendant acted maliciously or for a purpose other than bringing the plaintiff to justice; and (5) the plaintiff suffered deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding." *Johnson v. Knorr*, 477 F.3d 75, 81–82 (3d Cir.2007). Burke alleges two instances of malicious prosecution in his amended complaint: first, with respect to his arrest and prosecution for public drunkenness resulting from the incidents of April 6, 2008, and, second, with respect to his prosecution on baseless charges after filing a complaint with the Cheltenham Township Internal Affairs unit. Burke does not allege the involvement of Norris or any other municipal decisionmaker in the first incident, and, regarding the second incident, he fails to allege that this prosecution resulted in any deprivation of his liberty as *Knorr* requires. Norris's alleged actions under Count IV, then, did not deprive Burke of a federally protected right; they do not give rise to municipal liability as a result.

 Regarding Count V, to demonstrate a First Amendment retaliation claim under § 1983 a plaintiff must show "(1) constitutionally protected conduct, (2) an adverse action by [ ] officials sufficient to deter a person of ordinary firmness from exercising his constitutional rights, and (3) a causal link between the exercise of his [constitutional] rights and the adverse action taken against him." *Mitchell v. Horn*, 318 F.3d 523, 530 (3d Cir.2003) (internal punctuation omitted). As our Court of Appeals has noted, "[t]he Supreme Court has clearly held that prosecution of a citizen in retaliation 'for nonprovocatively voicing his objection' to police conduct impermissibly punishes constitutionally protected speech," *Losch v. Borough of Parksburg, Pa.*, 736 F.2d 903, 910 (3d Cir.1984) (quoting *Norwell v. City of Cincinnati*, 414 U.S. 14, 16, 94 S.Ct. 187, 38 L.Ed.2d 170

(1973)). Since Burke alleges in his complaint that "charges were brought [by Norris] as a direct consequence of the filing of the complaint," Am. Compl. at ¶ 153, Burke has made out a claim that Norris's actions deprived him a federally-protected right. Under *Bryan County*, Burke has therefore asserted a viable claim against the Township for retaliation in violation of the First Amendment.

■ As for Count VI, failure to train can be "thought of as a city policy or custom" if it "reflects a deliberate or conscious choice by the municipality." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 389, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989) (internal quotation marks omitted). Notably, Count VI is not like Counts IV or V, which allege behavior that in and of itself deprived Burke of a constitutional right; Burke can only claim under Count VI that the municipality's failure to train *eventually* led to his injury. Burke does not assert in his complaint, however, that Norris's actions gave rise to a failure to train that resulted in injury to him. Instead, he contends only that Norris's decision to prosecute Burke "communicated a message of approval to the Defendant Officers with respect to their conduct." Am. Compl. at ¶ 166. Since such ratification of allegedly unlawful conduct involves no cognizable injury to Burke, Norris's actions do not support a claim of municipal liability against the Township under Count VI.

Having examined Burke's claims regarding Norris, we now consider his claims with respect to the Township itself. In Counts III, IV, V, and VI, Burke alleges wrongdoing by the Township of Cheltenham. In Count III (alleging excessive force in violation of the Fourth Amendment and § 1983) Burke claims that "the use of excessive force by Officers Corbo, Chiofolo, O'Neil and Baskins was, is, and remains a part of a customary practice of the Cheltenham Police Department." Am. Compl. at ¶ 123. In Count IV, as part of his claim for malicious prosecution, Burke alleges that "Chief John Norris chose in his official capacity to, and the Township of Cheltenham ultimately did, prosecute Burke maliciously." *Id.* at 144. In the same Count he avers that "Lt. Salmon, Chief Norris, and Defendant, [*sic*] Township initiated the proceeding without a scintilla of probable cause in an attempt to squash [*sic*] the Complaint," *id.* at 146, and that "[d]efendant Township attempted to cover-up the damning recitation of facts and also attempted to deflect embarrassment to the Cheltenham police force by ruining Burke's name." *Id.* at 147. And, in Count V (alleging retaliation in violation of the First Amendment) Burke claims that "[a]s a result of making such speech he was adversely treated by the Township of Cheltenham, Chief John Norris, and Lieutenant Salmon when charges were brought as a direct consequence of the filing of the complaint." *Id.* at 153. Finally, in Count VI (failure to protect and prevent because of inadequately training) Burke alleges that "[t]he inadequately trained Defendants during their assault and false imprisonment of Burke acted, knowingly, recklessly, or with gross negligence, pursuant to official policy or custom," *id.* at ¶ 159. He also claims that "the Township of Cheltenham has wholly failed its duty to instruct, supervise, control, and discipline on a continuing basis Officers Corbo, Chiofolo, O'Neil, Baskins and Lt. Salmon," *id.* at ¶ 160, and that "[d]efendant Cheltenham Township had knowledge or, had the Police Department diligently exercised its duties to instruct, supervise, control, and discipline on a continuing basis, should have had knowledge that the wrongs ... committed by the Defendant Officers were about to, or were likely to be committed." *Id.* at ¶ 161.

We need not belabor Burke's allegations about the Township under Count V since we have already sustained his claim for municipal liability against the Township under that Count based upon Norris's actions. Turning to Count IV, we find that, while it alleges wrongdoing by the Township of Cheltenham, it simply fails to state a claim for municipal liability. Even if we take these allegations as well-pled, they do not suggest the existence of a "policy statement, ordinance, regulation, or decision officially adopted and promulgated by [the Township's] officers," or "constitutional deprivations visited pursuant to governmental 'custom,'" as *Monell* requires. Burke anthropomorphizes the Township and then accuses it of wronging him in much the same way that he accuses the individual defendant officers of lawlessness against him. Such *respondeat superior* allegations are not the stuff of *Monell* liability under § 1983.

Counts III and VI suffer from the opposite problem: in each count Burke alleges a policy or customary practice on the part of the Township underlying the stated violations, but his allegations constitute no more than conclusory statements, appended to the claims against the defendant police officers, that each violation occurred "because of official policy or custom." To be sure, Burke need not satisfy a "heightened pleading standard" to make out a § 1983 claim as *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 168, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993) teaches. But as with any complaint, Burke must provide "enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element." *Phillips v. County of Allegheny*, 515 F.3d 224, 234 (3d Cir.2008) (internal quotation marks omitted). Burke fails to present *any* facts regarding an official policy or custom on the part of the Township that caused civil rights violations to be made against him. Instead, he offers only bald assertions that such policies or customs existed without any support that would suggest that what happened to him on April 6, 2008 were not idiosyncratic actions of individual public actors. *Cf. Hall v. Raech*, 2009 WL 811503, at *5 (E.D.Pa.2009) (refusing to dismiss *Monell* claims where plaintiff identified a specific training deficiency, explained why prior events should have demonstrated to the municipality the need for training, and averred that the deficiency caused the violation of his constitutional rights); *A. v. Nutter*, 737 F.Supp.2d 341, 360–61, 2010 WL 3420106, at *14 (E.D.Pa. 2010) (refusing to dismiss *Monell* claims where plaintiffs alleged longstanding lack of compliance with child safety standards despite documented knowledge by municipal decisionmakers of areas of concern).

Burke's claims against the Township in Counts III, IV, and VI must therefore be dismissed, while the municipal liability claim in Count V must be sustained. Since the Township was the only defendant named in Count VI, we will dismiss that Count in whole. We will also dismiss Count IV in its entirety since we earlier dismissed Burke's claims against the other defendants—Corbo, Salmon, and Norris in their official capacities—under that Count.

### F. *The Individual Defendants' Right to Qualified Immunity*

Defendants suggest that they "are entitled to qualified immunity," though they do not elaborate on the grounds for this claimed entitlement beyond discussing some of the applicable case law. Defs.' Mot. to Dismiss at 13. Burke replies that the individual defendant officers are not entitled to qualified immunity inasmuch as they "did not make any reasonable mistakes as to what the law requires", but instead "wholly disregarded the law and

abused their authority as police officers when they employed unnecessary force, caused unreasonable searches, and effectuated a baseless arrest on Plaintiff for public drunkenness without having probable cause therefor." Pl.'s Resp. to Defs.' Mot. to Dismiss at 21.

■ A state official charged with both federal civil rights and pendent state tort claims may assert immunity with respect to both types of claims, but the standard governing immunity in each case is different. Federal "qualified immunity" has been established by case law, *Harlow v. Fitzgerald,* 457 U.S. 800, 807, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) ("Our decisions have recognized immunity defenses of two kinds"), but "official immunity" with respect to state claims in Pennsylvania is a creature of statute. *See* 42 Pa.C.S.A. §§ 8541–64. And while "Pennsylvania's official immunity standard is a subjective test ... Section 1983's standard is an objective test." *DeBellis v. Kulp,* 166 F.Supp.2d 255, 281 n. 28 (E.D.Pa.2001). Defendants' motion to dismiss, as already noted, offers only limited analysis in support of defendants' assertions of immunity, but what analysis is furnished all focuses on "qualified immunity" and federal case law elaborating on this topic. Notably, defendants' motion to dismiss does not cite 42 Pa.C.S.A. § 8541–64 or even mention "official immunity" under Pennsylvania law. We will thus take defendants' motion to dismiss as asserting only qualified immunity with respect to Burke's federal law claims under § 1983, and not official immunity with respect to Burke's pendent state tort claims.

■ Since the privilege of qualified immunity "is an immunity from suit rather than a mere defense to liability," *Saucier v. Katz,* 533 U.S. 194, 200–01, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001) (emphasis and internal quotation marks omitted), a court should address the issue "at the earliest possible stage in litigation." *Hunter v. Bryant,* 502 U.S. 224, 227, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991). Because "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known," *Harlow v. Fitzgerald,* 457 U.S. at 818, 102 S.Ct. 2727, "[u]nless the plaintiff's allegations state a claim of violation of clearly established law, a defendant pleading qualified immunity is entitled to dismissal before the commencement of discovery." *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985).

■ As the Supreme Court noted in *Saucier v. Katz,* courts do this inquiry in two steps. First, a court asks whether, "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Id.* 533 U.S. at 201, 121 S.Ct. 2151. Second, "if a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established." *Id.* This subinquiry probes whether there is "sufficient precedent at the time of the action, factually similar to the plaintiff's allegations, to put [the] defendant on notice that his or her conduct is constitutionally prohibited." *McKee v. Hart,* 436 F.3d 165, 171 (3d Cir.2006). But the Supreme Court recently clarified that *Saucier's* two-step sequence is not obligatory. "The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at

hand." *Pearson v. Callahan,* 555 U.S. 223, 129 S.Ct. 808, 818, 172 L.Ed.2d 565 (2009).

Burke alleges four constitutional violations at the hands of the individual defendant officers, but only three have survived our analysis thus far.[1] We will subject each Count to the analysis prescribed in *Pearson* and *Saucier,* beginning with Count I in which Burke asserts that "[t]he Defendant Officers also worked violations of the Plaintiff's Fourth Amendment right to be free of unreasonable searches when the Defendant Officers subjected him to two illegal strip-searches—one at Fenton Road and one in the Juvenile Holding Area of the Cheltenham Township Police Department." Am. Compl. at ¶ 96.

With respect to searches and seizures, "[t]he essential purpose of the proscriptions in the Fourth Amendment is to impose a standard of reasonableness upon the exercise of discretion by government officials, including law enforcement agents, in order to safeguard the privacy and security of individuals against arbitrary invasions." *Delaware v. Prouse,* 440 U.S. 648, 653–54, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979) (internal quotation marks omitted). We shall begin our analysis by dividing strip searches into two classes—those occurring at detention facilities and those incident to arrest.

Regarding the former, in 1979 the Supreme Court concluded, after considering "the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted," *Bell v. Wolfish,* 441 U.S. 520, 559, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), that a policy requiring all inmates at Bureau of Prison facilities to "expose their body cavities for visual in-spection as a part of a strip search conducted after every contact visit with a person from outside the institution" was reasonable under the Fourth Amendment. *Id.* at 558, 99 S.Ct. 1861. Over the next three decades, nearly every Circuit—but not our Circuit—interpreted *Wolfish* to mean "that an arrestee charged with minor offenses may not be strip searched consistent with the Fourth Amendment unless the prison has reasonable suspicion that the arrestee is concealing a weapon or other contraband." *Florence v. County of Burlington,* 621 F.3d 296, 299 (3d Cir. 2010) (summarizing circuit jurisprudence). Beginning in 2008, however, two circuits reversed themselves and "upheld a blanket policy of strip searching all arrestees" upon entering the general population of a jail, *id.,* and last month our Court of Appeals in *Florence* upheld blanket strip search procedures at two county correctional facilities "at the time of intake before arrestees enter the general population." *Id.* at 311.

Our Court of Appeals did admit in *Florence* that a blanket policy reduced the "potential for abuse" present in a strip search policy founded on official discretion. *Id.* This might be taken as a suggestion that only blanket strip search policies in detention facilities pass constitutional muster but not policies giving officials the option to strip search any arrestee without individualized suspicion.

 Even though the strip search in question here occurred in April of 2008—well before our Circuit decided *Florence*—we cannot find that the right of an arrestee—even one charged with a minor offense—not to be strip searched *while in a*

---

**1.** Specifically, Count I, alleging unlawful search and seizure under the Fourth Amendment (though we have only retained, under this count, Burke's claim that he was illegally strip searched); Count III, alleging excessive force under the Fourth Amendment; and Count V, alleging retaliation in violation of the First Amendment.

*correctional facility* was "clearly established" twenty-eight months ago. Baskins is therefore entitled to qualified immunity with respect to Burke's unlawful search and seizure claims arising out of the strip search of Burke at the Cheltenham Township Police station.

Regarding strip searches incident to arrest, however, Judge DuBois has recently noted that "[n]o Supreme Court case discusses the constitutionality of strip searches incident to arrest, which appear to fall between the 'full searches' considered by *Robinson* and the 'intrusions beyond the body's surface' considered by *Schmerber*." *Allison v. GEO Group, Inc.*, 611 F.Supp.2d 433, 442 (E.D.Pa.2009) (referring to *U.S. v. Robinson*, 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973), and to *Schmerber v. California*, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966)).

■■■ But the factors elucidated in *Wolfish* that must be considered before ruling on whether a strip search in prison is reasonable—"the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted," *id.* 441 U.S. at 559, 99 S.Ct. 1861—all militate against the legality of the street strip search described in Burke's complaint. According to Burke, he was strip searched to the point where he was "partially naked." Am. Compl. at ¶ 46. The search allegedly occurred through the exertion of great force, as one officer pushed Burke's face "into the asphalt" and the other two "began violently ripping off Burke's clothing and removing his shoes", *id.* at ¶¶ 41, 42. It also does not appear that the officers had much justification for their search, since Burke was not accused of possessing contraband or engaging in violent conduct. And of course the strip search allegedly occurred in a public place—the street. *Id.* at ¶ 46.

The Supreme Court has stated—to be sure, in *dicta*—that "the interests supporting a search incident to arrest would hardly justify disrobing an arrestee on the street, [though] the practical necessities of routine jail administration may even justify taking a prisoner's clothes before confining him," *Illinois v. Lafayette*, 462 U.S. 640, 645, 103 S.Ct. 2605, 77 L.Ed.2d 65 (1983). Thus a public strip search that fails the four-factor test of *Wolfish* would necessarily be unreasonable given that *Wolfish* explicitly dealt with strip searches *in prisons.*

Applying *Wolfish* to Burke's version of the facts, then, we conclude on this limited record that the arresting officers violated the Fourth Amendment when they searched Burke on Fenton Road. While this satisfies only the first prong of *Saucier*, what little precedent there is dealing with public strip searches suggests that such searches violate clearly established rights under *Saucier*'s second prong. Judge DuBois noted that "several circuit courts have ruled that strip searches are not included in the category of permissible searches incident to arrest," *Allison*, 611 F.Supp.2d at 442. In *Butler v. Hartlaub*, 2009 WL 199788, at *2 (M.D.Pa.2009), Judge Kane also concluded that an allegation of a public strip search raises "potential Fourth and Fourteenth Amendment violations." Moving outside of our Circuit, in *Moore v. Hearle*, 639 F.Supp.2d 352, 358 (S.D.N.Y.2009), Judge Robinson held—persuasively, in our view—that "[t]he right to be free from unreasonable searches, including public strip searches, is a clearly established constitutional right."

An issue of fact remains as to whether Burke was truly "strip-searched," given that he alleges only that he was left "partially naked." Am. Compl. at ¶ 46. Courts have suggested that for a strip search to have occurred, the suspect must

at least have been compelled to expose "his genitals and buttocks," *Lee v. City of South Charleston,* 668 F.Supp.2d 763, at 775 n. 3 (S.D.W.Va.2009), if not "to remove all of [his] clothing and subject [his] naked bod[y] to visual inspection." *Florence,* 621 F.3d at 300. But heeding the admonition that the pleader should be given the benefit of "all reasonable inferences" in deciding a Rule 12(b)(6) motion, we will read Burke's amended complaint as alleging that an intrusion rising to the level of a strip search occurred on Fenton Road. Having satisfied both of the *Saucier* prongs, we will therefore deny Corbo, Chiofolo, and O'Neil qualified immunity as to Count I of Burke's complaint, but only respecting the search that occurred on Fenton Road.

In Count III, Burke alleges that "Corbo, Chiofolo, O'Neil, and Baskins, made unreasonable and forceful contact with Plaintiff's person which under the circumstances was an excessive use of force." Am. Compl. at ¶ 118. According to our Court of Appeals's decision in *Rivas v. City of Passaic,* 365 F.3d 181 (3d Cir.2004):

> A claim for excessive force under the Fourth Amendment requires a plaintiff to show that a seizure occurred and that it was unreasonable.... The inquiry turns on objective reasonableness, meaning that the standard is whether the police officer's actions [were] objectively reasonable in light of the facts and circumstances facing the officer, regardless of the officer's intent or motivation.

*Id.* at 198 (internal quotations omitted).

Burke alleges that the named officers used excessive force against him, in part, because they lacked probable cause to arrest him—a ground we have already dismissed as foreclosed by *Heck v. Humphrey.* But Burke's complaint also describes a series of violent actions by Corbo, Chiofolo, O'Neil, and Baskins during and after his arrest.[2]

██ Taking the allegations in Burke's complaint as true, the asserted actions of the arresting officers were unreasonable. The Supreme Court has suggested that reasonableness under the Fourth Amendment can only be judged through "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor,* 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). By Burke's account, he was accused only of a minor, nonviolent offense and he did not pose a serious threat to anyone. He was not actively resisting arrest. Against these claimed realities, the roughness with which he was treated by Corbo, Chiofolo, O'Neil, and Baskins seems at this juncture excessive, and hence unreasonable under the Fourth Amendment. Moreover, we do not imagine that any reasonable officer would not have known that such roughness was excessive and unlawful under the circumstances. Consequently, we will deny the officers' assertions of qualified immunity with respect to Count III.

In Count V, Burke argues that he "engaged in constitutionally protected speech

---

2. Stating, for example, that Burke was thrown to the ground, that he was held there while his clothes were torn off and his skin was gouged, that he was kicked and repeatedly punched, that his head was intentionally battered against the roof of the police cruiser as he was transported to the police station, and that he was slammed into a wall at the police station's juvenile holding area. Am. Compl. at ¶¶ 38–45, 49, 55. Burke also alleges that "it was clear that: (i) Burke was cooperating with the officers; and (ii) was evidently not armed or dangerous." Am. Compl. at ¶ 122.

when he submitted his Internal Affairs Complaint," and that "engaging in protected speech was the substantial, motivating factor—in fact it is on the only factor [sic]—in causing the Township's retaliation against him in the form of a baseless prosecution." Am. Compl. at ¶¶ 152, 154. Since we have dismissed this Count against Norris in his official capacity, we are left only to consider whether Salmon has qualified immunity under this Count.

 Burke alleges in his amended complaint that he "filed the Internal Affairs complaint on April 9, 2008, alleging wrongful conduct of Officers Corbo, Chiofolo, O'Neil and Baskins stemming from his April 6, 2008 arrest," Am. Compl. at ¶ 70. Burke also alleges that "[o]n August 21, 2008, [he] received notice that he had been charged with eight (8) crimes by the Cheltenham Police Department," id. at ¶ 76, and that "[a]s a result of making such speech he was adversely treated by the Township of Cheltenham, Chief John Norris, and Lieutenant Salmon when charges were brought as a direct consequence of the filing of the complaint." Id. at ¶ 153. As explained in Part II.E, supra, our Court of Appeals has noted that "[t]he Supreme Court has clearly held that prosecution of a citizen in retaliation 'for nonprovocatively voicing his objection' to police conduct impermissibly punishes constitutionally protected speech," Losch, 736 F.2d at 910 (quoting Norwell v. City of Cincinnati, 414 U.S. 14, 16, 94 S.Ct. 187, 38 L.Ed.2d 170 (1973)). Since Burke has alleged that (1) he voiced objections to police conduct after which (2) he was prosecuted and (3) Salmon lodged the prosecution in retaliation for his objections, Burke has adequately pleaded a violation of a clearly established constitutional right. Consequently, we will deny qualified immunity to Salmon under Count V.

*ORDER*

AND NOW, this 5th day of October, 2010, upon consideration of plaintiff's amended complaint (docket entry # 7), defendants' partial motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) (docket entry # 10), and plaintiff's response thereto (docket entry # 11), and in accordance with the accompanying Memorandum, it is hereby ORDERED that:

1. Defendants' motion to dismiss is GRANTED as to Counts II, IV, and VI with respect to all defendants and all grounds;

2. Defendants' motion to dismiss is GRANTED as to Count I with respect to the grounds of unlawful seizure and illegal restraint in handcuffs, and with respect to defendant Baskins, but is DENIED with respect to the ground of unlawful search with respect to defendants Corbo, Chiofolo, and O'Neil;

3. Defendants' motion to dismiss is GRANTED as to Count III with respect to the ground of lack of probable cause and with respect to defendant Township of Cheltenham, but is DENIED with respect to the ground of disproportionate force with respect to defendants Corbo, Chiofolo, O'Neil, and Baskins;

4. Defendants' motion to dismiss is GRANTED as to Count V with respect to defendant Norris in his official capacity, but is DENIED with respect to defendant Township of Cheltenham and defendant Salmon in his individual capacity; and

5. Defendants' motion to dismiss is DENIED as to Counts VII and VIII with respect to all grounds and all defendants.