Justice Breyer,
with whom Justice Ginsburg, Justice Sotomayor, and Justice Kagan join, dissenting.
The petition for certiorari asks us to decide “[wjhether the Fourth Amendment permits a . . . suspicionless strip search of every individual arrested for any minor offense . . . .” Pet. for Cert. i. This question is phrased more broadly than what is at issue. The case is limited to strip searches of those arrestees entering a jail’s general population, see 621 *343 F. 3d 296, 298 (CA3 2010). And the kind of strip search in question involves more than undressing and taking a shower (even if guards monitor the shower area for threatened disorder). Rather, the searches here involve close observation of the private areas of a person’s body and for that reason constitute a far more serious invasion of that person’s privacy.
The visually invasive kind of strip search at issue here is not unique. A-similar practice is well described in Dodge v. County of Orange, 282 F. Supp. 2d 41 (SDNY 2003). In that New York case, the “strip search” (as described in a relevant prison manual) involved
“ ⅛ visual inspection of the inmate’s naked body. This should include the inmate opening his mouth and moving his tongue up and down and from side to side, removing any dentures, running his hands through his hair, allowing his ears to be visually examined, lifting his arms to expose his arm pits, lifting his feet to examine the sole, spreading and/or lifting his testicles to expose the area behind them and bending over and/or spreading the cheeks of his buttocks to expose his anus. For females, the procedures are similar except females must in addition, squat to expose the vagina.’ ” Id., at 46.
Because the Dodge court obtained considerable empirical information about the need for such a search in respect to minor offenders, and because the searches alleged in this case do not differ significantly, I shall use the succinct Dodge description as a template for the kind of strip search to which the question presented refers. See, e. g., 621 F. 3d, at 299 (alleging that officers inspected his genitals from an arm’s length away, required him to lift his genitals, and examined his anal cavity).
In my view, such a search of an individual arrested for a minor offense that does not involve drugs or violence — say, a traffic offense, a regulatory offense, an essentially civil *344 matter, or any other such misdemeanor — is an “unreasonable searc[h]” forbidden by the Fourth Amendment, unless prison authorities have reasonable suspicion to believe that the individual possesses drugs or other contraband. And I dissent from the Court's contrary determination.
l — l
Those confined in prison retain basic constitutional rights. Bell v. Wolfish, 441 U. S. 520, 545 (1979); Turner v. Safiey, 482 U. S. 78, 84 (1987) (“Prison walls do not form a barrier separating prison inmates from the protections of the Constitution”). The constitutional right at issue here is the Fourth Amendment right to be free of “unreasonable searches and seizures.” And, as the Court notes, the applicable standard is the Fourth Amendment balancing inquiry announced regarding prison inmates in Bell v. Wolfish, supra. The Court said:
“The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.” Id., at 559.
I have described in general terms, see supra, at 342-343, the place, scope, and manner of “the particular intrusion,” Bell, 441 U. S., at 559. I now explain why I believe that the “invasion of personal rights” here is very sérious and lacks need or justification, ibid. — at least as to the category of minor offenders at issue.
II
A strip search that involves a stranger peering without consent at a naked individual, and in particular at the most *345 private portions of that person’s body, is a serious invasion of privacy. We have recently said, in respect to a schoolchild (and a less intrusive search), that the “meaning of such a search, and the degradation its subject may reasonably feel, place a search that intrusive in a category of its own demanding its own specific suspicions.” Safford Unified School Dist. #1 v. Redding, 557 U. S. 364, 377 (2009). The Courts of Appeals have more directly described the privacy interests at stake, writing, for example, that practices similar to those at issue here are “demeaning, dehumanizing, undignified, humiliating, terrifying, unpleasant, embarrassing, [and] repulsive, signifying degradation and submission.” Mary Beth G. v. Chicago, 723 F. 2d 1263, 1272 (CA7 1984) (internal quotation marks omitted); see also, e. g., Blackburn v. Snow, 771 F. 2d 556, 564 (CA1 1985) (“‘[A]ll courts’” have recognized the “ ‘severe if not gross interference with a person’s privacy’ ” that accompany visual body-cavity searches (quoting Arruda v. Fair, 710 F. 2d 886, 887 (CAI 1983))). These kinds of searches also gave this Court the “most pause” in Bell, supra, at 558 (guards strip searched prisoners after they received outside visits). Even when carried out in a respectful manner, and even absent any physical touching, see ante, at 325, 339, such searches are inherently harmful, humiliating, and degrading. And the harm to privacy interests would seem particularly acute where the person searched may well have no expectation of being subject to such a search, say, because she had simply received a traffic ticket for failing to buckle a seatbelt, because he had not previously paid a civil fine, or because she had been arrested for a minor trespass.
In Atwater v. Lago Vista, 532 U. S. 318, 323-324 (2001), for example, police arrested a mother driving with her two children because their seatbelts were not buckled. This Court held that the Constitution did not forbid an arrest for a minor seatbelt offense. Id., at 323. But, in doing so, it pointed out that the woman was held for only an hour (before *346 being taken to a magistrate and released on bond) and that the search — she had to remove her shoes, jewelry, and the contents of her pockets, id., at 355 — was not “‘unusually harmful to [her] privacy or .. . physical interests.’ ” Id., at 354 (quoting Whren v. United States, 517 U. S. 806, 818 (1996)). Would this Court have upheld the arrest had the magistrate not been immediately available, had the police housed her overnight in the jail, and had they subjected her to a search of the kind at issue here? Cf. County of Riverside v. McLaughlin, 500 U. S. 44, 56 (1991) (presentment must be within 48 hours after arrest).
The petitioner, Albert W. Florence, states that his present arrest grew out of an (erroneous) report that he had failed to pay a minor civil fine previously assessed because he had hindered a prosecution (by fleeing police officers in his automobile). App. 25a-26a. He alleges that he was held for six days in jail before being taken to a magistrate and that he was subjected to two strip searches of the kind in question. 621 F. 3d, at 299.
Amicus briefs present other instances in which individuals arrested for minor offenses have been subjected to the humiliations of a visual strip search. They include a nun, a Sister of Divine Providence for 50 years, who was arrested for trespassing during an antiwar demonstration. Brief for Sister Bernie Galvin et al. as Amici Curiae 6. They include women who were strip searched during periods of lactation or menstruation. Id., at 11-12 (describing humiliating experience of female student who was strip searched while menstruating); Archuleta v. Wagner, 523 F. 3d 1278, 1282 (CA10 2008) (same for woman lactating). They include victims of sexual violence. Brief for Domestic Violence Legal Empowerment and Appeals Project et al. as Amici Curiae. They include individuals detained for such infractions as driving with a noisy muffler, driving with an inoperable headlight, failing to use a turn signal, or riding a bicycle without an audible bell. Brief for Petitioner 11, 25; see also Mary Beth *347 G., supra, at 1267, n. 2 (considering strip search of a person arrested for having outstanding parking tickets and a person arrested for making an improper left turn); Jones v. Edwards, 770 F. 2d 739, 741 (CA8 1985) (same for violation of dog leash law). They,include persons who perhaps should never have been placed in the general jail population in the first place. See ante, at 341 (Alito, J. concurring) (“admission to the general jail population, with the concomitant humiliation of a strip search, may not be reasonable” for those “whose detention has not been reviewed by a judicial officer and who could be held in available facilities apart from the general population”).
I need not go on. I doubt that we seriously disagree about the nature of the strip search or about the serious affront to human dignity and to individual privacy that it presents. The basic question before us is whether such a search is nonetheless justified when an individual arrested for a minor offense is involuntarily placed in the general jail or prison population.
HI
The majority, like the respondents, argues that strip searches are needed (1) to detect injuries or diseases, such as lice, that might spread in confinement, (2) to identify gang tattoos, which might reflect a need for special housing to avoid violence, and (3) to detect contraband, including drugs, guns, knives, and even pens or chewing gum, which might prove harmful or dangerous in prison. In evaluating this argument, I, like the majority, recognize: that managing a jail or prison is an “inordinately difficult undertaking,” Turner, 482 U. S., at 85; that prison regulations that interfere with important constitutional interests are generally valid as long as they are “reasonably related to legitimate penological interests,” id., at 89; that finding injuries and preventing the spread of disease, minimizing the threat of gang violence, and detecting contraband are “legitimate pe-nological interests,” ibid.; and that we normally defer to the *348 expertise of jail and prison administrators in such matters, id., at 85.
Nonetheless, the “particular” invasion of interests, Bell, 441 U. S., at 559, must be “ ‘reasonably related’ ” to the justifying “penological interest” and the need must not be “ ‘exaggerated,’ ” Turner, supra, at 87. It is at this point that I must part company with the majority. I have found no convincing reason indicating that, in the absence of reasonable suspicion, involuntary strip searches of those arrested for minor offenses are necessary in order to further the penal interests mentioned. And there are strong reasons to believe they are not justified.
The lack of justification is fairly obvious with respect to the first two penological interests advanced. The searches already employed at Essex and Burlington include: (1) pat frisking all inmates; (2) making inmates go through metal detectors (including the “Body Orifice Screening System (BOSS)” chair used at Essex County Correctional Facility that identifies metal hidden within the body); (3) making inmates shower and use particular delousing agents or bathing supplies; and (4) searching inmates’ clothing. In addition, petitioner concedes that detainees could be lawfully subject to being viewed in their undergarments by jail officers or during showering (for security purposes). Brief for Petitioner 9; Tr. of Oral Arg. 7-8 (“Showering in the presence of officers is not something that requires reasonable suspicion”). No one here has offered any reason, example, or empirical evidence suggesting the inadequacy of such practices for detecting injuries, diseases, or tattoos. In particular, there is no connection between the genital lift and the “squat and cough” that Florence was allegedly subjected to and health or gang concerns. See Brief for Academics on Gang Behavior as Amici Curiae; Brief for Medical Society of New Jersey et al. as Amici Curiae.
The lack of justification for such a strip search is less obvious but no less real in respect to the third interest, namely, *349 that of detecting contraband. The information demonstrating the lack of justification is of three kinds. First, there are empirically based conclusions reached in specific cases. The New York Federal District Court, to which I have re-' ferred, conducted a study of 23,000 persons admitted to the Orange County correctional facility between 1999 and 2003. Dodge, 282 F. Supp. 2d, at 69. These 23,000 persons underwent a strip search of the kind described,- supra, at 343. Of these 23,000 persons, the court wrote, “the County encountered three incidents of drugs recovered from an inmate’s anal cavity and two incidents of drugs falling from an inmate’s underwear during the course of a strip search.” 282 F. Supp. 2d, at 69. The court added that in four of these five instances there may have been “reasonable suspicion” to search, leaving only one instance in 23,000 in which the strip search policy “arguably” detected additional contraband. Id., at 70. The study is imperfect, for search standards changed during the time it was conducted. Id., at 50-51. But the large number of inmates, the small number of “incidents,” and the District Court’s own conclusions make the study probative though not conclusive.
Similarly, in Shain v. Ellison, 273 F. 3d 56, 60 (CA2 2001), the court received data produced by the county jail showing that authorities conducted body-cavity strip searches, similar to those at issue here, of 75,000 new inmates over a period of five years. Brief for Plaintiff-Appellee-Cross-Appellant in No. 00-7061 etc. (CA2), p. 16 (citing to its App. 343a-493a). In 16 instances the searches led to the discovery of contraband. The record further showed that 13 of these 16 pieces of contraband would have been detected in a patdown or a search of shoes and outer clothing. In the three instances in which contraband was found on the detainee’s body or in a body cavity, there was a drug or felony history that would have justified a strip search on individualized reasonable suspicion. Ibid.; Brief for National Police Accountability Project as Amicus Curiae 10.
*350 Second, there is the plethora of recommendations of professional bodies, such as correctional associations, that have studied and thoughtfully considered the matter. The American Correctional Association (ACA) — an association that informs our view of “what is obtainable and what is acceptable in corrections philosophy,” Brown v. Plata, 563 U. S. 493, 540 (2011) — has promulgated a standard that forbids suspicion-less strip searches. And it has done so after consultation with the American Jail Association, National Sheriffs’ Association, National Institute of Corrections of the Department of Justice, and Federal Bureau of Prisons. ACA, Performance-Based Standards for Adult Local Detention Facilities, Standard 4-ALDF-2C-03, p. 36 (4th ed. 2004); Dept, of Justice, Federal Performance-Based Detention Standards Handbook § C.6, p. 99 (rev-2 Feb. 23, 2011), http://www.justice.gov/ofdt/ fpbds02232011.pdf (all Internet materials as visited Mar. 30, 2012, and available in Clerk of Court’s case file); ACA, Core Jail Standards § 1-CORE-2C-02, pp. vii, 23 (2010). A standard desk reference for general information about sound correctional practices advises against suspicionless strip searches. Dept, of Justice, National Institute of Corrections, M. Martin & T. Rosazza, Resource Guide for Jail Administrators 4, 113 (2004); see also Dept, of Justice, National Institute of Corrections, M. Martin & P. Katsampes, Sheriff’s Guide to Effective Jail Operations 50 (2007).
Moreover, many correctional facilities apply a reasonable suspicion standard before strip searching inmates entering the general jail population, including the U. S. Marshals Service, Immigration and Customs Enforcement (ICE), and the Bureau of Indian Affairs. See U. S. Marshals Serv., Policy Directive, Prisoner Custody-Body Searches § 9.1(E)(3) (2010), http://www.usmarshals.gov/foia/Directives-Policy/prisoner_ops/body_searches.pdf; ICE, Office of Detention and Removal Operations (DRO), 2008 Operations Manual ICE Performance-Based National Detention Standard Searches of Detainees 1, http://www.ice.gov/doclib/dro/ *351 detention-standards/pdf/searches_of_detainees.pdf; id., ICE/DRO Detention Standard: Admission and Release 4-5, http://www.ice.gov/doclib/dro/detention-standards/pdf/ environmental_health_and_safety.pdf; Bureau of Indian Affairs, Office of Justice Servs., BIA Adult Detention Facility Guidelines 22 (Draft 2010). The Federal Bureau of Prisons (BOP) itself forbids suspicionless strip searches for minor offenders, though it houses separately (and does not admit to the general jail population) a person who does not consent to such a search. See Dept, of Justice, BOP Program Statement 5140.38, p. 5 (2004), http://www.bop.gov/policy/progstat/ 5140_038.pdf.
Third, there is general experience in areas where the law has forbidden here-relevant suspicionless searches. Laws in at least 10 States prohibit suspicionless strip searches. See, e.g., Mo. Rev. Stat. §544.193.2 (2011) (“No person arrested or detained for a traffic offense or an offense which does not constitute a felony may be subject to a strip search or a body cavity search . . . unless there is probable cause to believe that such person is concealing a weapon ... or contraband”); Kan. Stat. Ann. §22-2521(a) (2007) (similar); Iowa Code §804.30 (2009) (similar); Ill. Comp. Stat., ch. 725, § 5/103— 1(c) (West 2011) (similar but requiring “reasonable belief”); 501 Ky. Admin. Regs. 3:120, §3(l)(b) (2011) (similar); Tenn. Code Ann. §40-7-119 (2006) (similar); Colo. Rev. Stat. Ann. § 16-3-405(1) (2011) (no strip search absent individualized suspicion unless person has been arraigned and court orders that suspect be detained); Fla. Stat. § 901.211(2) (2010) (similar); Mich. Comp. Laws Ann. § 764.25a(2) (West 2000) (similar); Wash. Rev. Code § 10.79.130(1) (2010) (similar).
At the same time at least seven Courts of Appeals have considered the question and have required reasonable suspicion that an arrestee is concealing weapons or contraband before a strip search of one arrested for a minor offense can take place. See, e. g., Roberts v. Rhode Island, 239 F. 3d 107, 112-113 (CA1 2001); Weber v. Dell, 804 F. 2d 796, 802 *352 (CA2 1986); Logan v. Shealy, 660 F. 2d 1007,1013 (CA4 1981); Stewart v. Lubbock Cty., Tex., 767 F. 2d 153, 156-157 (CA5 1985); Masters v. Crouch, 872 F. 2d 1248, 1255 (CA6 1989); Mary Beth G., 723 F. 2d, at 1266, 1273; Edwards, 770 F. 2d, at 742; Hill v. Bogans, 735 F. 2d 391, 394 (CA10 1984). But see 621 F. 3d, at 311 (case below); Bull v. City and County of San Francisco, 595 F. 3d 964, 975 (CA9 2010) (en banc); Powell v. Barrett, 541 F. 3d 1298, 1307 (CA11 2008) (en banc). Respondents have not presented convincing grounds to believe that administration of these legal standards has increased the smuggling of contraband into prison.
Indeed, neither the majority’s opinion nor the briefs set forth any clear example of an instance in which contraband was smuggled into the general jail population during intake that could not have been discovered if the jail was employing a reasonable suspicion standard. The majority does cite general examples from Atlantic County and Washington State where contraband has been recovered in correctional facilities from inmates arrested for driving under the influence and disorderly conduct. Ante, at 335. Similarly, the majority refers to information, provided by San Francisco jail authorities, stating that they have found handcuff keys, syringes, crack pipes, drugs, and knives during body-cavity searches, including during searches of minor offenders, including a man arrested for illegally lodging (drugs), and a woman arrested for prostitution and public nuisance (“ ‘bin-dles of crack cocaine’ ”). Brief for City and County of San Francisco et al. as Amici Curiae 7-13; Bull, supra, at 969; ante, at 335. And associated statistics indicate that the policy of conducting visual cavity searches of all those admitted to the general population in San Francisco may account for the discovery of contraband in approximately 15 instances .per year. Bull, supra, at 969.
But neither San Francisco nor the respondents tell us whether reasonable suspicion was present or absent in any of the 15 instances. Nor is there any showing by the major *353 ity that the few unclear examples of contraband recovered in Atlantic County, Washington State, or anywhere else could not have been discovered through a policy that required reasonable suspicion for strip searches. And without some such indication, I am left without an example of any instance in which contraband was found on an individual through an inspection of their private parts or body cavities which could not have been found under a policy requiring reasonable suspicion. Hence, at a minimum these examples, including San Francisco’s statistics, do not provide a significant counterweight to those presented in Dodge and Shain.
Nor do I find the majority’s lack of examples surprising. After all, those arrested for minor offenses are often stopped and arrested unexpectedly. And they consequently will have had little opportunity to hide things in their body cavities. Thus, the widespread advocacy by prison experts and the widespread application in many States and federal circuits of “reasonable suspicion” requirements indicate an ability to apply such standards in practice without unduly interfering with the legitimate penal interest in preventing the smuggling of contraband.
The majority is left with the word of prison officials in support of its contrary proposition. And though that word is important, it cannot be sufficient. Cf. Dept, of Justice, National Institute of Corrections, W. Collins, Jails and the Constitution: An Overview 28-29 (2d ed. 2007) (Though prison officials often “passionately believed” similar requirements would lead to contraband-related security problems, once those requirements were imposed those “problems did not develop”).
The majority' also relies upon Bell, 441 U. S. 520, itself. Ante, at 326-327. In that case, the Court considered a prison policy requiring a strip search of all detainees after “contact visits” with unimprisoned visitors. 441 U. S., at 558. The Court found that policy justified. Id., at 560. Contrary to the majority’s suggestion, that case does not provide prece *354 dent for the proposition that the word of prison officials (accompanied by “one instance” of empirical example) is sufficient to support a strip search' policy. Ante, at 327. The majority correctly points out that there was but “one instance” in which the policy had led to the discovery of an effort to smuggle contraband. Bell, 441 U. S., at 558. But the Court understood that the prison had been open only four months. Id., at 526. And the Court was also presented with other examples where inmates attempted to smuggle contraband during contact visits. Id., at 559.
It is true that in Bell the Court found the prison justified in conducting postcontact searches even as to pretrial detainees who had been brought before a magistrate, denied bail, and “committed to the detention facility only because no other less drastic means [could] reasonably assure [their] presence at trial.” Id., at 546, n. 28. The Court recognized that those ordered detained by a magistrate were often those “charged with serious crimes, or who have prior records.” Ibid. For that reason, those detainees posed at least the same security risk as convicted inmates, if not “a greater risk to jail security and order,” and a “greater risk of escape.” Ibid. And, of course, in Bell, both the inmates at issue and their visitors had the time to plan to smuggle contraband in that case, unlike those persons at issue here (imprisoned soon after an unexpected arrest).
The Bell Court had no occasion to focus upon those arrested for minor crimes, prior to a judicial officer’s determination that they should be committed to prison. I share Justice Alito’s intuition that the calculus may be different in such cases, given that “[m]ost of those arrested for minor offenses are not dangerous, and most are released from custody prior to or at the time of their initial appearance before a magistrate.” Ante, at 341 (concurring opinion). As he notes, this case does not address, and “reserves judgment on,” whether it is always reasonable “to strip search an ar-restee before the arrestee’s detention has been reviewed by *355 a judicial officer.” Ante, at 342. In my view, it is highly questionable that officials would be justified, for instance, in admitting to the dangerous world of the general jail population and subjecting to a strip search someone with no crimi-. nal background arrested for jaywalking or another similarly minor crime, supra, at 346-347. Indeed, that consideration likely underlies why the Federal Government and many States segregate such individuals even when admitted to jail, and several jurisdictions provide that such individuals be released without detention in the ordinary case. See, e. g., Cal. Penal Code Ann. § 853.6 (West Supp. 2012).
In an appropriate case, therefore, it remains open for the Court to consider whether it would be reasonable to admit an arrestee for a minor offense to the general jail population, and to subject her to the “humiliation of a strip search,” prior to any review by a judicial officer. Ante, at 341 (Alito, J., concurring).
⅜ ⅜ ⅜
For the reasons set forth, I cannot find justification for the strip search policy at issue here — a policy that would subject those arrested for minor offenses to serious invasions of their personal privacy. I consequently dissent.